IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AIRFACTS, INC.              :

                           :

    v.                     :   Civil Action No. DKC 15-1489

                           :

DIEGO DE AMEZAGA           :

                           :

**MEMORANDUM OPINION**

After Defendant Diego de Amezaga ("Defendant") resigned his employment with Plaintiff AirFacts, Inc. ("Plaintiff" or "AirFacts"), Plaintiff commenced this action alleging breach of contract, misappropriation of trade secrets, and conversion. A five-day bench trial was held between January 25 and February 3, 2017. The following findings of fact and conclusions of law are issued pursuant to Fed.R.Civ.P. 52(a).[1]

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D.Va. 2008) (quoting Fed.R.Civ.P. 52(a) advisory committee's note to 1946 amendment). Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

## I. Factual Background

Plaintiff is a Delaware corporation that develops and licenses revenue accounting software for airlines. Its headquarters are located in Bethesda, Maryland. April Pearson has been CEO since May 2001, and from the start of her tenure as CEO, auditing has been the company's exclusive focus. (ECF No. 61, at 28:8-11, 29:17-23). Plaintiff's primary product is TicketGuard, an airfare auditing software product.[2] TicketGuard is used by airlines, including one department within American Airlines, to audit ticket sales by comparing tickets issued to an airline's fares, taking into account commissions, taxes, and industry rules for sales. Plaintiff's auditing process involves both an automated ticket review and a manual review. TicketGuard can also be used to audit refunds issued through a process that is partially automated. When violations are identified for a ticket, TicketGuard invoices the automated pricing systems or travel agents which priced the tickets in error on behalf of the airlines.

Plaintiff has also attempted to develop a proration software product to assist airlines in receiving revenue that accurately reflects industry standards and negotiated rates, which are recorded in special prorate agreements ("SPAs"), when

---

[2] TicketGuard customers access the product through an Internet webpage.

2

two or more airlines share ticket revenues in a single transaction. Plaintiff first began working "intermittently" and "sporadically" on a proration product in 2012 (ECF No. 61, at 70:25-71:9, 71:18-23), and entered into a contract with Alaska Airlines to develop a proration product on June 1, 2015 (PTX 172).[3] Although Ms. Pearson testified that Plaintiff had "a complete and finished product" that Plaintiff's airline client was evaluating at the time of the January 2017 trial, Plaintiff did not yet have a proration product in use. (*See* ECF No. 66, at 128:5-15).

Defendant was employed by Plaintiff from June 2008 until February 2015. He was hired as a product development analyst before being promoted to manager of product development and then director of product development. His primary responsibilities included working with programmers and coders to develop products and managing client relationships. In addition, he worked on the development and sales pitches for Plaintiff's proposed proration product. At the start of Defendant's employment with Plaintiff, the parties executed an "Employment Agreement." (PTX

---

[3] "PTX" refers to exhibits offered by Plaintiff at trial, and "DTX" refers to exhibits offered by Defendant. References to trial testimony are designated by the ECF docket entry of the official transcript and page number where available. Official transcripts were not prepared for the fourth or fifth days of the bench trial.

35).  The Employment Agreement restricted Defendant's post-employment opportunities for a twelve-month period.

Defendant first tendered his resignation to Plaintiff on October 10, 2014, but was convinced to continue his employment. In December, Defendant unsuccessfully applied for a position with Kayak, a metasearch engine that displays airline fares and is not Plaintiff's competitor or customer.  He emailed static screenshots of TicketGuard to Kayak in connection with his application.

On February 6, 2015, Defendant resigned a second time.  He did not have a job offer at that time and gave four weeks' notice, but at Ms. Pearson's direction, his last day was February 13, 2015.  Both Ms. Pearson and Randy Laser, who had recently been hired as Plaintiff's Vice President of Airline Strategy, told Defendant they would contact him after he left if they had questions about his work.  In his last week of work, Defendant printed documents on which he had been working, and on his last day, he emailed a spreadsheet related to proration on which he had been working to his personal email account.  On March 11, Defendant applied for a position with Fareportal, a travel agency.  (PTX 8).  Fareportal is not a competitor or customer of Plaintiff's, but TicketGuard is used to audit tickets sold by Fareportal. (ECF No. 72, at 18:2-9).  Defendant emailed two flowcharts which he had created for Plaintiff to

Fareportal in connection with his application. (PTX 6-7). He accessed the flowcharts by logging in to an AirFacts' LucidChart account on March 11. Defendant remained unemployed from February 13 until May 11, 2015, when he began working at American Airlines as a senior manager in the Refunds department.

American Airlines is Plaintiff's largest customer. U.S. Airways had begun using TicketGuard in 2006, and after U.S. Airways merged with American Airlines, American Airlines began using TicketGuard in its Travel Agency Audit department to audit domestic travel agency ticket sales in 2014.[4] Prior to the airline merger, Plaintiff had discussed the development of a proration product for U.S. Airways in 2013, but the project did not come to fruition. American Airlines has a contract with Accelya Kale for proration work, and Plaintiff has never pitched a proration product to American Airlines.

When Defendant began working for American Airlines, American Airlines assured Plaintiff that Defendant was not performing services that were in competition with, or similar to, services that were provided by Plaintiff. Defendant maintains that his work at American Airlines did not involve performing any services that were restricted by the Employment

---

[4] The airline merger officially took place in December 2013, but Plaintiff and American Airlines entered into a service provider agreement in September 2014. (PTX 171; *see also* ECF No. 66, at 145:3-22).

Agreement.  Plaintiff alleges that Defendant's work for American Airlines constitutes a breach of the Employment Agreement, and further alleges that Defendant misappropriated trade secrets. Further facts will be discussed as relevant to the various legal issues.

## II.  Procedural Background

The three-count complaint, filed May 22, 2015, alleges breach of contract; misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md.Code Ann., Com. Law I § 11-1201, *et seq.*; and conversion, and seeks money damages as well as injunctive relief.  (ECF No. 1). Plaintiff filed a motion for a temporary restraining order and preliminary injunctive relief with the complaint.  (ECF No. 2). Following a hearing, the court granted the temporary restraining order, temporarily restraining and enjoining Defendant from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any document that related to his employment with Plaintiff or any document or electronically stored information belonging to or received from Plaintiff.  (ECF Nos. 2; 6). Defendant filed an answer (ECF No. 9), and responded in opposition to the motion for a preliminary injunction (ECF No. 14).  Upon the consent of the parties, the court granted a preliminary injunction ordering Defendant to return and not

retain originals or copies of any property, including confidential information, obtained from Plaintiff. (ECF No. 23). The order also required Defendant to provide Plaintiff access to all electronic devices for forensic evaluation. Discovery closed on September 30, 2016 (ECF No. 43), and the case proceeded to a bench trial.

Although Plaintiff's breach of contract claim alleges violations of several provisions of the Employment Agreement, Plaintiff narrowed its claim during trial to a breach of paragraph 8, the non-solicitation of clients provision. Plaintiff also acknowledged at trial that it had recovered or deleted all AirFacts documents within Defendant's custody, possession, or control through forensic measures, and that it had not proven its conversion claim. The court took the matter under advisement after the trial concluded and reviewed the pleadings, trial transcripts, and admitted exhibits. For the reasons set forth below, the court concludes that Plaintiff has not met its burden to prove by a preponderance of the evidence that Defendant breached the Employment Agreement or committed a violation of the MUTSA.

## III. Findings of Fact and Conclusions of Law

### A.   Count I, Breach of Contract Claim

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum

state's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Maryland follows the rule of *lex loci contractus* for contract claims, applying the substantive law of the state where the contract was formed in the absence of a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573 (1995); *Kronovet v. Lipchin*, 288 Md. 30 (1980). The Employment Agreement includes a choice of law provision submitting to "the internal laws of the State of Maryland." (PTX 35 ¶ 10.1). Accordingly, Maryland law governs the Plaintiff's breach of contract claim.

The relevant paragraph of the Employment Agreement states:

8.   NON-SOLICITATION OF CLIENTS

8.1 During employee's employment and for a period of 12 months thereafter or from the date of entry by a court of competent jurisdiction of a final judgment enforcing this covenant (whichever is later), employee will not, without the prior written consent of the employer, either directly or indirectly, for the benefit of anyone other than the employer:

    . . . .

(d) Perform services for, own, work for, consult, be employed by, or become financially interested in any [of] the employer's customers (as defined below) unless the services being performed [are] not in competition with, or similar to, either (i) the services or products provided

8

by the employer during the term of the
employee's employment or (ii) anticipated
services or products of the employer of
which the employee has material knowledge.

8.2 Customers . . . shall include any
customer who within the twelve months prior
to the date of employee's termination has
been a customer of the employer; or to whom
the employee has directly or indirectly made
or had knowledge of, within the twelve
months prior to the date of employee's
termination, a proposal for becoming a
customer of the employer.

(PTX 35 ¶ 8).

Plaintiff contends that Defendant violated the non-
solicitation provision of the Employment Agreement in working
for American Airlines. American Airlines became a TicketGuard
client in October 2014, and accordingly, was a "customer" as
defined in paragraph 8.2. Defendant disputes that his
employment at American Airlines violated the terms of the
Employment Agreement.

Paragraph 8.1(d) prohibited Defendant from competing with
Plaintiff by providing services to a customer that were "in
competition with, or similar to . . . the services or products
provided *by the employer* during the term of the employee's
employment" or to "anticipated services or products *of the
employer*[.]" (PTX 35 PPP 8.1(d) (emphasis added)). Plaintiff
has argued that this provision also prohibited Defendant from
providing services to a customer that were similar to those he

had provided to Plaintiff during his employment. It introduced evidence purporting to show that Defendant is "doing similar work and applying similar techniques that he learned at AirFacts" in his work for American Airlines, such as managing projects and directing coders, using industry and technical knowledge he gained through his employment with AirFacts. Under the plain language of the contract, the Employment Agreement prohibited Defendant only from providing services to a customer that were in competition with those services provided by Plaintiff, not services that were similar to the work he had performed for Plaintiff during his employment.[5] It is therefore irrelevant to Plaintiff's claim for breach of the non-solicitation provision whether Defendant, for example, managed other employees or served as a project manager, while working for both Plaintiff and American Airlines.

---

[5] The Employment Agreement does contain a separate twelve-month restriction prohibiting Defendant from "engag[ing] in activities or contribut[ing] skills and knowledge substantially related to duties performed at AirFacts to any business or entity in competition with AirFacts' business" (PTX 35 ¶ 7.2), which was cited in the complaint (ECF No. 1 ¶¶ 27, 40). As noted above, Plaintiff narrowed its claim during trial to paragraph 8.1(d). Plaintiff has not introduced any evidence that American Airlines was a "business or entity in competition with AirFacts' business," and therefore cannot prove that Defendant breached this provision by working for American Airlines.

### 1.   Refunds

At American Airlines, Defendant works as the senior manager of the Refunds department within the Revenue Accounting department.   He reports to Brenda Fullmer, a director in the Revenue Accounting department who oversees five departments, including the Refunds department and the Proration department. Ms. Fullmer does not oversee the Travel Agency Audit department, which is the American Airlines department that uses TicketGuard. The Travel Agency Audit department is also within the Revenue Accounting department, but is overseen by Beth Monick and managed by Mary Ann Michulsky.   The Refunds department is responsible for processing passenger ticket refund requests.   It uses a proprietary automated process for passenger refunds, which was first used by America West Airlines, then by U.S. Airways after it merged with American West, and is now used by American Airlines following the U.S. Airways-American merger. Defendant oversees the Refunds department, managing approximately 100 employees.   (PTX 90).

TicketGuard provides auditing services.   While TicketGuard may be used to audit refunds, it does not process refunds.[6]   Ms.

---

[6]   Again, while Defendant's work for Plaintiff involved automating processes relating to the auditing of refunds and understanding the ATPCO categories for refunds, the employment restriction concerns only those services or products provided by Plaintiff.   Plaintiff does not provide services or products relating to the processing of refunds.   It was suggested at

Pearson testified that "you cannot process a refund without auditing the original ticket," meaning that, in order to process a refund, an airline would first "have to go through the same process that you do when you're auditing. So you need to make sure that the ticket was refundable. You need to know if there are any penalties. If it is refundable, you need to calculate the refund amount." (ECF No. 71, at 59:9-19). Plaintiff contends that processing a refund of a direct sale ticket for a customer, so that the fare can be refunded to the passenger, is "the same process" as auditing an agency sale ticket for the airline, so that the airline may bill the travel agency if the agency issued the fare in error. (*Id.* at 60:4-23). Plaintiff concedes that these processes are done for different business purposes, but argues that Defendant should not be permitted under the agreement to perform this similar process.

Defendant did not develop the refund processing system at American Airlines, which was in use before he began his employment, and his responsibilities at American Airlines involve managing employees, not directly processing refunds himself. Even assuming that the services Defendant performed for American Airlines in managing the Refunds department

trial by Plaintiff's counsel that Plaintiff had unsuccessfully pitched an internal refund processing product to U.S. Airways in 2010, but Plaintiff has not proven that it provided refund processing products or services or that such products or services were anticipated.

included automating refund processing or manually processing refunds, Plaintiff has not proven that those services were in competition with or similar to its services. Auditing ticket sales or refunds and processing refunds may involve the application of some of the same industry or airline rules, but they are separate and distinct processes performed for different purposes. Plaintiff provides refund auditing services, but it does not provide refund processing products or services, and Defendant's work for American Airlines clearly did not involve performing services in competition with Plaintiff. As noted above, these functions are the responsibilities of separate departments led by different managers and directors at American Airlines. Moreover, Plaintiff has not shown that Defendant or American Airlines actually processes refunds in a way that is at all similar to the TicketGuard process for auditing refunds. Ms. Pearson testified that she would process a refund in the same way that she would audit a refund or ticket sale, but she cannot attest to American Airline's refund process. Ms. Fullmer testified that she considers "auditing a ticket and calculating just the refund based on resulting values . . . completely different processes." (ECF No. 66, at 79:10-15). As she explained:

> One is you are trying to determine whether a
> ticket was sold properly and if they met all
> of the rules of the ticket in order to

purchase the price that they got for the ticket. The other process is, we have sold a ticket, the customer has the ticket, has decided not to use the full or partial part of the ticket, and we are just calculating whatever value was remaining and giving them their money back.

(*Id.* at 79:16-22; *see also id.* at 81:8-82:7 ("[R]efunds isn't looking to see whether someone who processed it sold it properly or refunded it properly. . . . We are looking to . . . calculate[] the value and refund[] the value back to the customer.")). Plaintiff has not shown that American Airline's preexisting proprietary system processes refunds using the same or similar processes as TicketGuard uses to audit ticket sales and refunds.

Plaintiff has also argued that Defendant's work on refunds breached the agreement because he interacted with American Airlines employees in or formerly in the Travel Agency Audit department. The Refunds department at American Airlines primarily processes refunds of company sales, but Defendant did work with the Travel Agency Audit department on a backlog of international agency ticket refunds, which it was responsible for processing. (*See* PTX 197). Those refunds would not have been audited by TicketGuard under American Airline's contract with Plaintiff, but Plaintiff contends that such refunds could

have been audited by TicketGuard.[7]  This is immaterial.  Even showing Defendant processed refunds for tickets that had been or were later audited by TicketGuard would only further demonstrate that Defendant provided services to American that were dissimilar to and not in competition with those provided by Plaintiff.

Plaintiff has also emphasized that Defendant is now reporting to Ms. Fullmer at American Airlines, who had, prior to September 2012, managed U.S. Airways' travel agency audit department, and therefore had interacted with Defendant during that time as a TicketGuard customer.  The Employment Agreement plainly does not prohibit Defendant from working for any industry contact he made during his employment.  If this connection has any probative value, the fact that Ms. Fullmer had not managed the department which used TicketGuard for years before hiring Defendant underscores that he was not providing services to American Airlines similar to or in competition with those provided by Plaintiff.  Similarly, the Employment Agreement plainly did not restrict Defendant from occasionally working with American Airlines employees in the Travel Agency

---

[7] While TicketGuard can be used to audit both direct airline ticket sales and travel agency sales, American Airlines does not use TicketGuard to audit its own sales.  (ECF No. 66, at 146:7-16).  TicketGuard is also used by other AirFacts customers to audit international agency sales, but American Airlines uses it only to audit domestic agency sales.  (*See* ECF No. 71, at 66:19-67:24).

Audit department on non-auditing matters simply because they used TicketGuard.[8]

Plaintiff has not proven that Defendant breached the Employment Agreement through his work in the Refunds department or in connection with refunds for American Airlines.

### 2. Proration

Plaintiff contends that Defendant also breached paragraph 8.1(d) by performing services for American Airlines that were similar to or in competition with its anticipated proration product, of which Defendant had material knowledge.

### a. Plaintiff Had an Anticipated Proration Service or Product of which Defendant Had Material Knowledge

The proration product is under development for Alaska Airlines pursuant to a contract Plaintiff entered into on June 1, 2015. (PTX 172). Alaska Airlines first approached Plaintiff about developing a proration product in 2012, and Plaintiff had worked on it "sporadically" and "intermittently" since that time. (ECF No. 61, at 71:1-5, 20-23). Ms. Pearson testified that Plaintiff's proration product development "really started in earnest in 2014," and that Defendant spent approximately half of his time working on the product between October 2014 and his

_____

[8] Moreover, while some of the contact between Defendant and the Travel Agency Audit department occurred in January 2016 (_see_ PTX 197), the Employment Agreement did not bar Defendant from performing any services for American Airlines after February 13, 2016.

16

resignation in February 2015. (*Id.* at 71:20-72:11). Defendant testified that, at the time of his resignation, Plaintiff was in the midst of working out a contract with Alaska Airlines for a proration product, and that he alone had been working on material pieces of the potential product. Although Plaintiff did not enter into a contract for the development of the proration product until after Defendant's resignation, the court concludes that the proration product was anticipated at that time, and that Defendant had material knowledge of the anticipated product.

The proration product was an anticipated product for Alaska Airlines, but not for American Airlines. American Airlines was a customer only of the TicketGuard auditing product.[9] Plaintiff argues that the Employment Agreement prohibits Defendant from providing to any AirFacts customer services in competition with or similar to anticipated services or products for any other AirFacts customer, not just those services Plaintiff performed for that customer. At the time the parties entered into this agreement in 2008, this would have been a distinction without a difference. Plaintiff had one core product, TicketGuard, which

---

[9] Plaintiff and U.S. Airways did discuss the development of a proration product in 2013, and Ms. Pearson testified that Plaintiff "knew that [American Airlines] had been interested in our proration product." (ECF No. 61, at 113:8-14). Ms. Fullmer testified that American Airlines was not considering and had not considered changing proration products since 2013. (ECF No. 66, at 65:17-67:3).

17

provided auditing services. Assuming *arguendo* that the provision should be read as Plaintiff contends, Plaintiff has not proven that Defendant performed services for American Airlines that were similar to or in competition with Plaintiff's anticipated proration product for Alaska Airlines.

### b. Defendant Did Not Perform Proration Services for American Airlines

Defendant does not work in the Proration department at American Airlines and has not been involved in the development or use of a proration engine similar to that under development by Plaintiff. American Airlines has an in-house proration system that has been in use since it was America West Airlines, which is used to prorate "a very small number of transactions." (ECF No. 66, at 66:23-67:3). The majority of its proration transactions are outsourced to Accelya Kale, a proration vendor. (*Id.*). There is no evidence that Defendant has provided proration services to American Airlines.

What Plaintiff has shown at trial is that Defendant attended weekly staff meetings which were also attended by the senior manager of the Proration department; that he was occasionally copied on emails that were relevant to both the Refunds and Proration departments; and that, as the Revenue Accounting point of contact on a project, he served as a conduit for information relating to the project between departments

outside Revenue Accounting and those inside Revenue Accounting, including Proration. Plaintiff argues that *any mention* of "auditing," "proration," or "SPAs," either directly to Defendant or to other employees at a meeting or on an email where Defendant was in attendance or included for unrelated reasons, was a violation of the provision.[10] Such an interpretation goes far beyond the plain language of the Employment Agreement, and would amount to a restriction on working in the airline industry at all. Defendant was arguably prohibited from providing proration services to American Airlines similar to or in competition with those that Plaintiff anticipated providing to Alaska Airlines, and Plaintiff has not proven that he did so.

---

[10] Plaintiff emphasized at trial an email Ms. Fullmer sent to her team, which was prepared by American Airlines' in-house counsel, instructing them to avoid discussing these topics with Defendant in light of his Employment Agreement with Plaintiff. (PTX 38). It is far from clear that the email was intended as an opinion on the extent or reach of the non-solicitation clause, but even if it were plainly meant to be an interpretation of the agreement, the interpretation of a contract by counsel for a third-party years after the contract was entered into by the parties would be entitled to no evidentiary weight in interpreting the contract. Any legal advice given to Defendant's new employer on how best to avoid a violation or the appearance of a violation of the Employment Agreement was not binding, and any business determination by that employer not to follow the advice could not constitute evidence of a breach by Defendant of his employment contract with Plaintiff. Even if the advice to American Airlines' employees to avoid discussing proration software or SPAs with Defendant was reasonable, it would not make it a reasonable interpretation of paragraph 8.1(d) of the Employment Agreement.

Plaintiff has not proven that Defendant breached the Employment Agreement, and accordingly, judgment will be entered in favor of Defendant on Plaintiff's breach of contract claim.

**B.   Count II, Maryland Uniform Trade Secrets Act Claim**

Plaintiff alleges that Defendant violated the MUTSA by misappropriating trade secret information contained in several documents and files.  It is Plaintiff's burden to prove that the materials at issue were both trade secrets and were misappropriated.   Under the MUTSA, the definition of "Trade secret" is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Code Ann., Com. Law I § 11-1201(e).

The Restatement (First) of Torts sets forth six factors for courts to consider in determining whether given information constitutes a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the

20

> extent of measures taken by him to guard the
> secrecy of the information; (4) the value of
> the information to him and to his
> competitors; (5) the amount of effort or
> money expended by him in developing the
> information; (6) the ease or difficulty with
> which the information could be properly
> acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. b. "Although all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute." *Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 784 (1991); *see also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993). "Misappropriation" can be either the acquisition of a trade secret of another by improper means, defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," or the disclosure or use of a trade secret of another. *Id.* § 11-1201(b)-(c).

Plaintiff's claim consists of four separate alleged trade secret violations: (1) screenshots of the TicketGuard library and upload user interface, sent by email from Defendant to Kayak on December 24, 2014, in connection with a job application (PTX 17); (2) "pseudocode" relating to Fare By Rule processing, which Defendant printed during his last week of employment, as

captured by Spector 360 software (PTX 14-16); (3) flowcharts relating to the Fare By Rule, which Defendant downloaded from LucidChart and sent by email to Fareportal on March 11, 2015, in connection with a job application (PTX 6-7); and (4) a spreadsheet relating to the Alaska Airlines proration product, which Defendant emailed from his work email account to his personal email account on his final day of employment (PTX 21-23).[11]

Forensic evidence showed that Defendant used these documents as described, and he does not dispute that he acquired or used these materials. The questions before the court are whether these materials were protected trade secrets and whether Defendant's acquisition or use was in violation of the MUTSA. The materials must be considered individually.

---

[11] Evidence was also introduced regarding documents Defendant sent to his personal email account or stored in an AirFacts Dropbox account in 2009, 2011, and 2013. (PTX 1-4). Plaintiff's counsel stated in closing argument that Plaintiff considered these documents to be relevant to Defendant's credibility, but that it did not advance claims for their misappropriation. The purported cost of the misappropriation of these documents was included in Plaintiff's expert's damages calculations, however. As these documents were used by Defendant during his employment long before his resignation and not accessed or used after his employment ended, the court agrees that Plaintiff has not proven they were acquired by improper means. The court finds Defendant's testimony, that he simply did not recall that these documents were still in his personal email account or stored in a company Dropbox account, to be credible.

## 1.  TicketGuard Screenshots

Defendant emailed two static screenshots of the TicketGuard user interface to Kayak in connection with a job application on December 24, 2014.  (PTX 17).  The screenshots showed the "library" page and the upload user interface page of a TicketGuard client's webpage interface.  Defendant created the screenshots while logged in to his own TicketGuard account, and concedes that he did not receive authorization from Plaintiff to create or use the screenshots in connection with his job application.  Plaintiff contends that the screenshots are trade secrets because they reveal the type of interface TicketGuard provides to its customers, a feature that sets Plaintiff apart from its competitors.

For the screenshots to be protected under the MUTSA, Plaintiff must prove that the static display of the TicketGuard user interface was the subject of reasonable efforts to maintain its secrecy.  Plaintiff made some efforts that would have contributed to keeping the TicketGuard interface secret, such as including confidentiality provisions in its employment agreements with employees (*see* PTX 35 ¶ 2), using a system of passwords to prevent unauthorized access (ECF No. 72, at 57:20-58:2), and including a provision relating to confidential information, defined to include AirFacts' "user interface designs," in its service provider agreements with its clients

(*see, e.g.*, PTX 172 ¶ 8).  *See Trandes Corp.*, at 664.  However,
in light of the other evidence presented, these steps fail to
show that reasonable efforts were taken to maintain the
interface's secrecy.  It is not clear that Plaintiff provides
passwords to its customers to maintain the secrecy of its
interface, rather than to maintain the secrecy of its customer's
information and to limit access to the number of users for which
the customer paid a licensing fee.  The confidentiality
provision of the service provider agreements also limits
disclosure only outside the airline, rather than, for example,
to any non-authorized user.  (PTX 172 ¶ 8).  A customer's
contractors or service providers may access the software on its
behalf with written permission from Plaintiff, "not to be
unreasonably withheld."  (*Id.* ¶ 5(a)).  Most significantly,
TicketGuard is regularly demonstrated to prospective clients and
at its booths at industry trade shows.[12]  These demonstrations
would reveal not only the interface pages sent by Defendant, but

---

[12]  Plaintiff argued that it is significant that Defendant
sent screenshots from live client accounts rather than from a
"test" account that could be used when demonstrating the
product.  It did not prove that a "test" account was used for
demonstrations, however, or that there would have been any
difference in the information shown in the screenshots.  The
screenshots were static, and did not reveal client information
or enable the recipient to "click through" the links shown.
Moreover, even if client information had been disclosed through
Defendant's use of the client pages rather than the test pages,
Plaintiff' clients' data would not be Plaintiff's own trade
secret.

all the TicketGuard screens and its functionality. There is no evidence that Plaintiff required prospective customers to sign non-disclosure agreements before viewing the user interface. Plaintiff has not proven that the front-end appearance of its interface was the subject of reasonable efforts to maintain its secrecy, and accordingly, it is not trade secret information.

### 2.    Printed "Pseudocode"

In October 2014, Ms. Pearson assigned two development projects to Defendant, one relating to the Fare By Rule display and the other to the SPA proration framework. (*See* ECF No. 71, at 41:16-18).    During the final week of his employment with Plaintiff, Defendant cut and pasted "pseudocode" relating to the Fare By Rule display into a notepad document, then printed the documents. (PTX 14-16). These actions were captured by Spector 360 monitoring software installed on Plaintiff's employees' computers.

Plaintiff has not proven that this information was trade secret information.    Defendant testified that he had been asked to translate ATPCO code into text, which he would do by copying column names from an ATPCO database and the text display for that information from ATPCO's Fare Manager tool into a single document.[13]    Plaintiff's programmers would then be able to use

---

[13]    "ATPCO" is the Airline Tariff Publishing Company, an organization that collects and distributes fare information or

this translation document for coding. He copied and pasted the information because it was faster than retyping, and the information that was being copied and pasted all came from ATPCO. The documents contained information from ATPCO that was generally known to subscribed users of ATPCO, and to the extent that the document Defendant created by combining information from two ATPCO sources had economic value, the information was readily ascertainable by proper means by persons who subscribed to ATPCO.

In addition, Plaintiff has not proven that Defendant misappropriated this material. Although Ms. Pearson testified that it was unusual to print such a document (*see* ECF No. 72, at 22:1-10, 24:1-8), Defendant testified that Plaintiff's employees would regularly print their work and it was a matter of personal preference. Defendant was authorized to be working on the document when he printed it, and Plaintiff has not proven that Defendant retained the printed copy of this material. While Plaintiff's counsel suggested in his closing argument that Defendant had deleted this material before leaving AirFacts and not left it for Plaintiff's use, this contention is unsupported by the evidence. Defendant testified that he would normally

the airline and travel industry. AirFacts pays a monthly subscription to ATPCO to access its data and data application, which "describe[s] how to use ATPCO data." (ECF No. 71, at 26:5-21).

have saved the material in JIRA, an issued tracking system used by Plaintiff's employees to communicate internally, and Ms. Pearson testified that Defendant "put it electronically in the JIRA that he was assigned . . . so the programmer could look at it." (ECF No. 72, at 23:18-23; *see also id.* at 22:3-7). Plaintiff has not proven that Defendant misappropriated trade secret information by printing these materials.

### 3. Fare By Rule Flowcharts

On March 11, 2015, Defendant retrieved two flowcharts that were part of the same Fare By Rule display project as the "pseudocode" and sent them to a prospective employer. (PTX 6-7) He retrieved them from a LucidChart online data modeling service account he had created while working for AirFacts. Ms. Pearson testified that they "describe[e] the decisions and the data tables and the ATPCO fares database," and "took a lot of time" for Defendant to develop. (ECF No. 71, at 38:12-17). Ms. Pearson testified that they contain "processing logic," that is "entirely proprietary and sensitive to our process." (ECF No. 71, at 47:9-13). Defendant testified, however, that the charts show how ATPCO displays Fare By Rule text in Fare Manager, and that they contained standard ATPCO processing information, and Cindy Regan, Plaintiff's director of client accounts, testified that the charts were "an overview . . . of what Fare By Rule is," and that competitors did not have the information in "this

form" (ECF No. 72, at 54:4-55:14).  Although Defendant may have created a visual display of ATPCO data that was unique, the underlying ATPCO information was widely known within the industry.  These flowcharts did not contain information or processes unique to Plaintiff; rather, they provided an overview of APTCO's processes for Plaintiff's employees' use.  Moreover, both the information in the flowcharts and the flowcharts themselves appear to have been widely known to Plaintiff's employees, as was their intended purpose.  Ultimately, Plaintiff has not proven that this information derives independent economic value from not being generally known and not being readily ascertainable to others who can obtain economic value from their disclosure or use, nor has Plaintiff shown that it took reasonable efforts to maintain their secrecy.  Although Defendant was not authorized to acquire or use the LucidChart flowcharts as he did, Plaintiff has not proven that the flowcharts were trade secrets.

### 4. SPA Proration Framework and Database Model

On February 13, 2015, his last day at AirFacts, Defendant emailed the SPA proration framework and a database model on which he had been working since October 2014 to his personal email account from his AirFacts email account.  (PTX 21-23).  As shown by Plaintiff's Spector 360 monitoring software, he then deleted the copy of this email saved in his work email "sent"

folder.  (PTX 15C; ECF No. 64, at 63:20-64:17).  The documents
Defendant emailed were incomplete, but had taken months to
develop.  They represent the database tables that would be used
to store SPA contract information in the proration engine under
development.  Plaintiff has shown that this framework and
database model derive potential independent economic value from
not being generally known.[14]

Plaintiff did not necessarily take specific security
measures to protect these documents.  It has not shown, for
example, that the documents were designated internally as
confidential, that they were password protected, or that access
to these documents was limited within AirFacts to those
employees who reasonably needed access.  *See PADCO Advisors,
Inc. v. Omdahl*, 179 F.Supp.2d 600, 604, 610 (D.Md. 2002) (noting
that, where databased alleged to be a trade secret was protected
by "firewalls" and passwords, "[t]he strongest support for [the]
argument that it has been kept secret is that only about 23
employees out of 160 have access to this database and everyone
who is granted access is required to sign the [confidentiality
agreement]").  Ms. Pearson testified that "all members of the
team were working on" the proration product development,

---

[14] This value, however, lies only in the process or method
represented by the framework.  The fact that the framework
contained some actual pricing data from Plaintiff's customer's
expired, anticipated, or active SPAs is not relevant to this
claim, as such information is not Plaintiff's trade secret.

however. (ECF No. 61, at 72:24-73:3). Plaintiff's employees used individual passwords to access their work computers generally, and Spector 360 monitoring software was installed on those computers to track employees' usage. (*See* ECF No. 72, at 100:18-21). Ms. Pearson also testified that, in order to protect Plaintiff's confidential information generally, "all of our employees sign confidentiality clauses as part of their employment agreement." (ECF No. 71, at 10:6-13; *see* PTX 35 ¶ 2. *But see* ECF No. 64, at 136:7-137:12, 155:2-18 (Plaintiff's director of technical development, Li Ying, testified that all employees were asked to sign a confidentiality statement after Defendant's resignation)). Chief Technology Officer of Open Source Consulting Group James Mlodgenski, who worked on the database diagram (PTX 22) with Defendant, testified that the diagram was confidential and that AirFacts and Open Source Consulting Group had a non-disclosure agreement in place. (ECF No. 64, at 120:7-16). The court concludes that reasonable efforts were made to maintain the secrecy of these documents, and accordingly, Plaintiff has proven that they contained trade secrets.

A current employee authorized to access trade secrets may acquire those trade secrets by improper means. In *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288 (2004), for example, the Court of Appeals of Maryland held that an outgoing employee acquired

30

trade secrets by improper means when he burned digital copies of documents from his company laptop to a compact disc on three occasions, created a second copy of the disc, and retained hard copies of documents. The court noted that the employee had erased information from his company laptop, "suggest[ing] that [the employee] was attempting to hide his conduct and was aware that transferring the files was improper," and that he "again demonstrated an intent to hide his possession of trade secrets when he told his supervisor that 'everything' had been returned, although numerous hard-copy trade secrets remained in [his] possession." *Id.* at 314-15. The trial court had not found the employee's justifications for his actions to be credible, and the Court of Appeals found this evidence sufficient to support the finding that the employee had acquired trade secrets by improper means. It relied on *Bond v. PolyCycle*, 127 Md.App. 365 (1999), where:

> the former engineer of a plastic recycling company, on the evening prior to resigning, "took all of the work product that he had done in the preceding two years on improving [the company's technology], placed it on a floppy disc, [and] then erased it from the company computers." Because this technology was a trade secret belonging to the company, Bond did not have authority to take it.

*Id.* at 313 (alterations in original) (quoting *Bond*, 127 Md.App. at 377). *But see Diamond v. T. Rowe Price Assocs., Inc.*, 852 F.Supp. 372, 409-12 (D.Md. 1994) (holding that former employee

who retained company documents at her home after the termination of her employment did not acquire them by improper means because they were within the scope of her legitimate business duties and she was allowed to have such documents at her home while she was an employee).

Upon consideration of the evidence presented, the court concludes that Plaintiff has not proven that Defendant misappropriated the documents under the MUTSA. As the creator or co-creator of the documents, Defendant was clearly authorized to access them. The evidence proves that he was instructed to and did continue to work on this project through February 13, his last day. Defendant emailed the documents to himself at his personal email address as he had previously done in order to work remotely. This may not have been an explicitly authorized practice, but other employees also used personal email accounts for AirFacts business or worked on home computers.[15]

Defendant testified that he sent these documents to his personal email account because had been asked to be available to answer questions after he left and he wanted to be able to answer any questions that arose. Defendant believed that Plaintiff was close to signing a contract with Alaska Airlines,

_____

[15] When Mr. Laser contacted Defendant at his personal email address to ask him work-related questions following Defendant's departure, for example, he did so using his own personal email account. (*See* DTX 3; ECF No. 72, at 87:10-12).

and testified that he felt a responsibility to the client. Although Ms. Pearson testified that she had not instructed Defendant to take copies of the documents, she had told Defendant that she and other employees would contact him if they had questions about his work. (ECF No. 71, at 24:19-25:3). As noted, this project had made up approximately half of Defendant's workload in the four months before his resignation. (ECF No. 61, at 71:24-72:11). Mr. Laser also asked Defendant if he would be available to answer questions after having left AirFacts because, based on his industry experience, "when somebody leaves . . . there is a grace period of being able to ask questions once they leave if there is anything that is outstanding or products that are incomplete[.]" (ECF No. 72, at 85:12-20). Mr. Laser did contact Defendant with questions after his departure (*id*. at 85:21-24), as did Ms. Ying (ECF No. 64, at 137:13-21).

The court finds Defendant's testimony to be credible. The forensic analysis of Defendant's personal email account and computer show that he did not access the documents after the end of his employment. (*See* DTX 7). Use or disclosure of a trade secret is not required to prove misappropriation, but this evidence lends credibility to Defendant's testimony that he took copies of the documents only in case he needed them to answer questions from Plaintiff's employees, which he ultimately did

not. It is unclear why Defendant deleted the sent copy of his email, but he also used his work computer and email account to send the documents and testified that he was aware of the monitoring software on his computer. Accordingly, this is not convincing evidence that Defendant knew his actions were improper and intended to hide those actions. A breach of a duty to maintain secrecy can constitute improper means, and Defendant continued to be bound by the confidentiality provision of his Employment Agreement after his resignation. Plaintiff has not proven that he breached that duty to maintain secrecy by maintaining the documents in his personal email account, however, particularly given that Plaintiff's employees consulted Defendant through his personal email on substantive internal issues following his resignation. Defendant was authorized to access the documents when he did so, and Plaintiff has not proven that he acquired them by improper means.

Accordingly, although the court finds that the documents Defendant emailed to himself on his last day of employment were entitled to trade secret protection, Plaintiff has not proven that Defendant misappropriated the documents.

## IV. Preliminary Injunction

In his closing argument, Defendant's counsel argued that the preliminary injunction should be terminated. The parties consented to the entry of the preliminary injunction, which

provided that Defendant would return AirFacts' property and allow Plaintiff to have access to his electronic media and accounts for a forensic evaluation. (ECF No. 23). Defendant was also ordered not to disclose proprietary, confidential, or trade secret materials. The order was not broader than the confidentiality provision of the Employment Agreement, and that provision, unlike the non-solicitation and conflicts of interest provisions, does not expire after twelve months. (PTX 35 ¶ 2). Nevertheless, the purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction necessarily expires upon entry of a final judgment. There is no basis on which to grant permanent injunctive relief.

## V.   Defendant's Motion *in Limine*

Shortly before trial, Defendant filed a motion *in limine* to exclude evidence regarding TicketGuard documents and damages based upon an unjust enrichment theory (ECF No. 48), which was discussed at a pretrial conference held on December 13, 2017 (ECF No. 47). To the extent any objections were not resolved or waived during trial and remain, they will be denied as moot.

## VI.  Plaintiff's Motion to Seal and Motion for Redaction

Plaintiff moved for a protective order sealing the trial transcripts and exhibits shortly before trial, requesting that

the court temporarily seal the trial transcripts and exhibits and permit Plaintiff 60 days to review and selectively redact confidential and proprietary information. (ECF No. 59). The court did not grant the motion prior to trial (*see* ECF No. 61, at 4:20-5:6), and Plaintiff moved for redactions of the trial transcripts after the trial ended (ECF No. 76). Accordingly, Plaintiff's motion for a protective order will be denied as moot, and the court will consider Plaintiff's motion for redactions.

Plaintiff requests limited redactions of testimony that describes in detail features of AirFacts' confidential and proprietary software that AirFacts contends differentiates the software from its competitors. It also requests that specific pricing information AirFacts received from its customers and agreed to hold in confidence be redacted from the transcripts. (ECF No. 76, at 2-3). Defendant does not object to this motion.

A.    **Standard of Review**

At issue in any request to redact or seal are the principles of common-law access and the more rigorous First Amendment analysis that applies to judicial records. "[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *In re United States for an Order Pursuant to 18 U.S.C. Section 2703[(D)]*, 707 F.3d 283, 290 (4th Cir.

2013).  The United States Court of Appeals for the Fourth Circuit recently reminded us that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny. *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004).  "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment."  [*In re United States for an Order*, 707 F.3d at 290] (quoting *Va. Dep't of State Police*, 386 F.3d at 575) (internal quotation marks omitted).  The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that "countervailing interests heavily outweigh the public interests in access." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988).  By contrast, the First Amendment secures a right of access "only to particular judicial records and documents," *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988), and, when it applies, access may be restricted only if closure is "necessitated by a compelling government interest" and the denial of access is "narrowly tailored to serve that interest." *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501,

510 (1984) (internal quotation marks
omitted)).

*Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014). The
First Amendment right of access applies to judicial records made
part of a dispositive motion or entered into evidence at trial.
*See Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 121 (D.Md.
2009) (citing *Va. Dep't of State Police*, 386 F.3d at 576;
*Rushford*, 846 F.2d at 253); *Level 3 Commc'ns, LLC v. Limelight
Networks, Inc.*, 611 F.Supp.2d 572, 576, 589 (E.D.Va. 2009).
Furthermore, "[t]he burden to overcome a First Amendment right
of access rests on the party seeking to restrict access, and
that party must present specific reasons in support of its
position." *Va. Dep't of State Police*, 386 F.3d at 575 (citing
*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 15 (1986)).

**B.   Analysis**

The court did not rely on Plaintiff's customer's specific
pricing information, and Plaintiff's motion to redact these
three lines of testimony from the January 25, 2017 morning
session transcripts will be granted.

The court did rely on testimony describing the proprietary
features of Plaintiff's software and SPA framework in the
decisional process.   Considered during the adjudication of a
civil trial, these portions of the transcripts constitute a
judicial record subject to the First Amendment right of access.

*See In re U.S. for an Order*, 707 F.3d at 290; *Level 3 Commc'ns*, 611 F.Supp.2d at 590. Consequently, the court must weigh the appropriate competing interests to determine whether the redactions are "justified by 'an overriding interest based on findings that closure is essential to preserve higher values.'" *Level 3 Commc'ns*, 611 F.Supp.2d at 590 (quoting *Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984)). "A corporation may possess a strong interest in preserving the confidentiality of its proprietary and trade-secret information, which in turn may justify partial sealing of court records." *Pub. Citizen*, 749 F.3d at 269; *see also Level 3 Commc'ns*, 611 F.Supp.2d at 591.

Plaintiff claims these features are proprietary and trade secret information, and the court has found that the SPA framework is entitled to trade secret protection. Accordingly, the court determines that the limited redactions requested are justified by Plaintiff's interest in preserving the confidentiality of these materials. Plaintiff's motion for redactions will be granted.

## VII. Conclusion

For the foregoing reasons, judgment will be entered in favor of Defendant on all counts in the complaint. Defendant's motion *in limine* and Plaintiff's motion to seal will be denied

as moot.  Plaintiff's motion for redactions will be granted.  A

separate order will follow.

                                                           /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge