IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | : |
| AIRFACTS, INC. | |
| | : |
| v. | : Civil Action No. DKC 15-1489 |
| | : |
| DIEGO DE AMEZAGA | |
| | : |

**MEMORANDUM OPINION**

This action is again before the court to adjudicate the claims of Plaintiff AirFacts, Inc. ("Plaintiff" or "AirFacts") against Defendant Diego de Amezaga ("Defendant") for breach of employment contract and misappropriation of trade secrets. After a five-day bench trial, the court entered judgment for Defendant on all counts. (ECF No. 78). Plaintiff appealed to the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed the judgment in part, vacated it in part, and remanded certain claims to determine whether Defendant breached his employment contract or misappropriated Plaintiff's trade secrets. The following findings of fact and conclusions of law are issued pursuant to Fed.R.Civ.P. 52(a).[1]

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is

## I.   Factual Background

The following recitation is taken from the court's earlier opinion.  Plaintiff is a Delaware corporation that develops and licenses revenue accounting software for airlines.   Its headquarters are located in Bethesda, Maryland.  April Pearson has been CEO since May 2001 and, from the start of her tenure as CEO, auditing has been the company's exclusive focus.  (ECF No. 61, at 28:8-11, 29:17-23).  Plaintiff's primary product is TicketGuard, an airfare auditing software product.[2]  TicketGuard is used by airlines to audit ticket sales by comparing tickets issued to an airline's fares, taking into account commissions, taxes, and industry rules for sales.  Plaintiff's auditing process involves both an automated ticket review and a manual review.  TicketGuard can also be used to audit refunds issued through a process that is partially automated.  When violations are identified for a ticket, TicketGuard invoices the automated pricing systems or travel agents which priced the tickets in error on behalf of the airlines.

---

no need for 'over-elaboration of detail or particularization of facts.'"  *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D.Va. 2008) (quoting Fed.R.Civ.P. 52(a) advisory committee's note to 1946 amendment).  Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient."  *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

[2] TicketGuard customers access the product through an Internet webpage.

Plaintiff has also attempted to develop a proration software product to assist airlines in receiving revenue that accurately reflects industry standards and negotiated rates, which are recorded in special prorate agreements ("SPAs"), when two or more airlines share ticket revenues in a single transaction. Plaintiff first began working "intermittently" and "sporadically" on a proration product in 2012 (ECF No. 61, at 70:25-71:9, 71:18-23), and entered into a contract with Alaska Airlines to develop a proration product on June 1, 2015 (PTX 172).[3] Although Ms. Pearson testified that Plaintiff had "a complete and finished product" that Plaintiff's airline client was evaluating at the time of the January 2017 trial, Plaintiff did not yet have a proration product in use. (*See* ECF No. 66, at 128:5-15).

Defendant was employed by Plaintiff from June 2008 until February 2015. He was hired as a product development analyst before being promoted to manager of product development and then director of product development. His primary responsibilities included working with programmers and coders to develop products and managing client relationships. In addition, he worked on the development and sales pitches for Plaintiff's proposed proration product. At the start of Defendant's employment with Plaintiff,

---

[3] "PTX" refers to exhibits offered by Plaintiff at trial, and "DTX" refers to exhibits offered by Defendant. References to trial testimony are designated by the ECF docket entry for the official transcript and page number where available.

the parties executed an "Employment Agreement." (PTX 35). The Employment Agreement restricted Defendant's post-employment opportunities for a twelve-month period.

Defendant first tendered his resignation to Plaintiff on October 10, 2014, but was convinced to continue his employment. In December, Defendant unsuccessfully applied for a position with Kayak, a metasearch engine that displays airline fares and is not Plaintiff's competitor or customer. He emailed static screenshots of the TicketGuard library and upload user interface to Kayak in connection with his application.

On February 6, 2015, Defendant resigned a second time. He did not have a job offer at that time and gave four weeks' notice, but at Ms. Pearson's direction, his last day was February 13, 2015. Both Ms. Pearson and Randy Laser, who had recently been hired as Plaintiff's vice president of airline strategy, told Defendant they would contact him after he left if they had questions about his work. In his last week of employment, Defendant printed documents on which he had been working, and on his last day, he emailed a spreadsheet related to proration on which he had been working to his personal email account. On March 11, Defendant applied for a position with Fareportal, a travel agency. (PTX 8). Fareportal is not a competitor or customer of Plaintiff's, but TicketGuard is used to audit tickets sold by Fareportal. (ECF No. 72, at 18:2-9). Defendant emailed two flowcharts which he had

created for Plaintiff to Fareportal in connection with his application. (PTX 6-7). He accessed the flowcharts by logging in to an AirFacts' LucidChart account on March 11. Defendant remained unemployed from February 13 until May 11, 2015, when he began working at American Airlines as a senior manager in the Refunds department.

Plaintiff alleges that Defendant breached his Employment Agreement and misappropriated Plaintiff's trade secrets. Defendant maintains that his actions were not restricted by the Employment Agreement and he did not misappropriate Plaintiff's trade secrets. Further facts will be discussed as relevant to the various legal issues.

## II.  Procedural Background

The three-count complaint, filed May 22, 2015, alleged breach of contract; misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md.Code Ann., Com. Law I § 11-1201, *et seq.*; and conversion, and sought money damages as well as injunctive relief. (ECF No. 1). Plaintiff filed a motion for a temporary restraining order and preliminary injunctive relief with the complaint. (ECF No. 2). Following a hearing, the temporary restraining order was granted, temporarily restraining and enjoining Defendant from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any document

5

that related to his employment with Plaintiff or any document or electronically stored information belonging to or received from Plaintiff. (ECF Nos. 2 & 6). Defendant filed an answer (ECF No. 9), and responded in opposition to the motion for a preliminary injunction (ECF No. 14). Upon the consent of the parties, the court granted a preliminary injunction ordering Defendant to return and not retain originals or copies of any property, including confidential information, obtained from Plaintiff. (ECF No. 23). The order also required Defendant to provide Plaintiff access to all electronic devices for forensic evaluation. Discovery closed on September 30, 2016 (ECF No. 43), and the case proceeded to a bench trial on January 25, 2017.

Plaintiff acknowledged at trial that it had recovered or deleted all AirFacts documents within Defendant's custody, possession, or control through forensic measures, and that it had not proven its conversion claim. The court took the matter under advisement after the trial concluded and reviewed the pleadings, trial transcripts, and admitted exhibits.

Judgment was entered in favor of Defendant and against Plaintiff on all counts. (ECF No. 79). This court found that Defendant did not violate the Employment Agreement's non-solicitation clause. (ECF No. 78, at 13, 18). The court also determined that Defendant did not violate the MUTSA with respect to the following property: the Fare By Rule flowcharts sent by

6

Defendant to a prospective employer (*id.*, at 26); the proration framework and database model Defendant emailed to himself on his last day of employment (*id.*, at 32); the TicketGuard screenshots sent by Defendant to a prospective employer (*id.*, at 24-25); and the pseudocode Defendant printed out the week before resigning (*id.*, at 26).  Relying on statements made by Plaintiff's counsel at trial, the court also concluded that Plaintiff abandoned its breach of contract claims under sections 2.2 and 4.2 of the Employment Agreement relating to confidential information.  (*Id.*, at 7).  Plaintiff appealed this court's findings that "(1) [] Defendant did not violate the non-solicitation provisions; (2) [] AirFacts abandoned its claims for breach of sections 2.2 and 4.2; (3) [] the Fare by Rule Flowcharts were not trade secrets; and (4) [] the Proration Framework and Database Model were not misappropriated."  (ECF No. 107, at 4).   The Fourth Circuit affirmed the findings that there was no breach of the non-solicitation clause and that the proration framework and database model were not misappropriated.  (ECF No. 95-1).  The Fourth Circuit determined, however, that Plaintiff had not abandoned its claims for breach of sections 2.2 and 4.2 of the Employment Agreement and that the Fare By Rule flowcharts are trade secrets.[4] This case was remanded to determine whether Defendant breached

---

[4] The Fourth Circuit determined that Plaintiff waived any section 7.2 claim.  (*Id.*, at 13 n.6).

sections 2.2 or 4.2 of the Employment Agreement, or misappropriated the flow charts in violation of the MUTSA.   No new evidence was presented, but additional legal argument was presented in writing and orally on May 14, 2019.  (ECF Nos. 110, 112).  Plaintiff filed a supplemental post-remand memorandum on May 28, 2019.  (ECF No. 111).

For the reasons set forth below, the court concludes that Plaintiff has proven by a preponderance of the evidence that Defendant breached the Employment Agreement and violated MUTSA, but has failed to prove that any breach was material or that any damages are due for the violation of MUTSA.  Accordingly, judgment will be entered for nominal damages.

## III. Findings of Fact and Conclusions of Law

### A.   Count I, Breach of Contract Claim

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007).  Maryland follows the rule of *lex loci contractus* for contract claims, applying the substantive law of the state where the contract was formed in the absence of a choice-of-law provision in the contract.  *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573 (1995); *Kronovet v. Lipchin*, 288 Md. 30 (1980).  The Employment Agreement

8

includes a choice-of-law provision submitting to "the internal laws of the State of Maryland." (PTX 35, ¶ 10.1). Accordingly, Maryland law governs Plaintiff's breach of contract claim.

A breach of contract claim entails proof:

> that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation. *See Continental Masonry Co., Inc. v. Verdel Const. Co., Inc.,* 279 Md. 476, 480, 369 A.2d 566, 569 (1977). It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages. *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.,* 271 Md. 565, 572-73, 318 A.2d 514, 518 (1974); *Asibem Assoc., Ltd. v. Rill,* 264 Md. 272, 276, 286 A.2d 160, 162 (1972); *Rotwein v. Bogart,* 227 Md. 434, 438, 177 A.2d 258, 260 (1962); *Gilbert Const. Co. v. Gross,* 212 Md. 402, 412, 129 A.2d 518, 523 (1957); *Envelope Co. v. Balto. Post Co.,* 163 Md. 596, 606, 163 A. 688, 692 (1933); *see Mallis v. Faraclas,* 235 Md. 109, 116, 200 A.2d 676, 680 (1964).

*Taylor v. Nationsbank, N.A.*, 365 Md. 166, 175 (2001).

The relevant paragraphs of the Employment Agreement state:

> 4.2.
>
> Upon termination of his engagement with AirFacts for any reason, the Employee shall promptly deliver to AirFacts all equipment, computer software, drawings, manuals, letters, notes, notebooks, reports, and other material and records, of any kind and all copies thereof (including copies on written media, magnetic storage, or other computer storage media), that may be in the possession of, or under the control of, the Employee, pertaining to Confidential Information

9

acquired and Inventions developed by the
Employee during the term of his engagement
with AirFacts.

. . .

2.2.

During or after the term of his engagement
with AirFacts, the Employee will not make any
unauthorized use of, will not disclose, and
will maintain the secrecy and in confidence,
as the secret and sole property of AirFacts,
any Confidential Information.   The Employee
will not, in any event, disclose or use any
Confidential Information, or information or
knowledge described immediately above, unless
the Employee receives specific permission in
writing from the President of AirFacts to
disclose or use such Confidential Information
and the Employee agrees to disclose or use
such information only as directed or permitted
by AirFacts.   Such information shall remain
the sole property of AirFacts and Consultant
agrees to return all property (including all
copies and summaries) upon request and/or upon
the termination of this Agreement.   It is the
expressed intent of this Agreement that
Consultant not disclose to any third party
Confidential Information learned in the
performance of Services hereunder concerning
the business of AirFacts or its clients.

(PTX 35, ¶¶ 4, 2).  Confidential information is defined at section

2.1 of the Employment Agreement:

The Employee recognizes and acknowledges that
it will have access to confidential,
proprietary and/or sensitive business
information, including but not limited to
actual or potential customer information,
marketing information, financial information,
techniques, software, code, proprietary data
and trade secrets of AirFacts, and other
entities doing business with AirFacts,
relating to but not limited to management,

> marketing, technical, financial, research and
> development, and other business-related
> activities, and that he/she may conceive,
> perfect, improve, use or develop, solely and
> jointly with others, inventions, discoveries,
> improvements, ideas, techniques, know-how,
> computer programs, technical data, financial
> data, marketing data, customer lists, code,
> software, and/or other information which
> constitutes confidential information,
> including but not limited to trade secrets of
> AirFacts (hereinafter all forms of information
> referenced above shall collectively be
> referred to as "Confidential Information") and
> that such Confidential Information
> constitutes valuable, special and unique
> property of AirFacts, and/or other entities
> doing business with Airfacts.

(*Id.*, ¶ 2).  Notably, trade secrets are specifically included in the definition of confidential information.

Plaintiff contends that Defendant misappropriated its trade secrets and violated sections 2.2 and 4.2 of the Employment Agreement by accessing AirFacts' LucidChart account, downloading the Fare By Rule flowcharts, and disclosing those flowcharts to FarePortal, a prospective employer.  Plaintiff also contends that Defendant violated section 4.2 of the Employment Agreement by emailing himself the proration framework and database model on his last day of employment.[5]  It claims that documents found on

_____

[5] This court determined, and the Fourth Circuit affirmed, that these materials are trade secrets but were not misappropriated. Plaintiff's counsel stated at trial that these documents have not been disclosed to any third party, and thus, Plaintiff agrees that Defendant did not violate section 2.2 of the Employment Agreement with respect to these materials.  (ECF No. 112, at 28-29).

11

Defendant's electronic devices, a straight sales processing diagram and a home commission table, were retained in violation of his employment agreement. Plaintiff further maintains that Defendant breached sections 2.2 and 4.2 of the Employment Agreement by printing out pseudocode the week before resigning.[6]  Defendant disputes Plaintiff's contentions, arguing that the flowcharts were not misappropriated and that he did not breach the Employment Agreement.

### 1. Section 4.2

Section 4.2 required Defendant to, "upon termination," "promptly deliver to AirFacts all . . . material and records. . . [including] copies thereof . . . pertaining to Confidential Information acquired . . . during the term of his . . . [employment]." (PTX 35, ¶ 4).  Plaintiff argues that Defendant breached section 4.2 with respect to the proration framework and database model, pseudocode, Fare By Rule flowcharts, and other documents earlier emailed to his personal account.  It introduced

---

[6] Plaintiff unequivocally abandoned any argument as to the TicketGuard screenshots.  Plaintiff acknowledged this court's prior ruling that the screenshots are not trade secrets because they contain public information and were shown to prospective clients at trade shows.  The Fourth Circuit affirmed this ruling.  Further, Plaintiff's counsel acknowledged that Plaintiff did not appeal the ruling regarding the screen shots, is not arguing that Defendant breached the Employment Agreement as a result of the screen shots, and stated that the "Ticket Guard screen shots . . . are no longer part of the claims before this Court." (ECF No. 109, at 20).

evidence showing that Defendant retrieved the Fare By Rule flowcharts after his employment terminated, emailed himself the proration framework and database model on his last day of employment, and printed out the pseudocode the week before leaving AirFacts.  The other documents were emailed by Defendant much earlier in his employment.

    a.    **SPA Proration Framework and Database Model**

On February 13, 2015, his last day at AirFacts, Defendant emailed the SPA proration framework and a database model on which he had been working since October 2014 to his personal email account from his AirFacts email account.  (PTX 21-23).  As shown by Plaintiff's Spector 360 monitoring software, he then deleted the copy of this email saved in his work email "sent" folder.  (PTX 15C; ECF No. 64, at 63:20-64:17).  The documents Defendant emailed were incomplete, but had taken months to develop.  They represent the database tables that would be used to store SPA contract information in the proration engine under development.

Ms. Pearson testified that "all members of the team were working on" the proration product development.  (ECF No. 61, at 72:24-73:3).  Plaintiff's employees used individual passwords to access their work computers generally, and Spector 360 monitoring software was installed on those computers to track employees' usage.  (*See* ECF No. 72, at 100:18-21).  Ms. Pearson also testified that, in order to protect Plaintiff's confidential information

generally, "all of our employees sign confidentiality clauses as part of their employment agreement." (ECF No. 71, at 10:6-13; *see* PTX 35, ¶ 2; *but see* ECF No. 64, at 136:7-137:12, 155:2-18 (Plaintiff's director of technical development, Li Ying, testified that all employees were asked to sign a confidentiality statement after Defendant's resignation)). Chief technology officer of Open Source Consulting Group James Mlodgenski, who worked on the database diagram (PTX 22) with Defendant, testified that the diagram was confidential and that AirFacts and Open Source Consulting Group had a non-disclosure agreement in place. (ECF No. 64, at 120:7-16). Plaintiff has shown that this framework and database model pertain to confidential information.

Upon consideration of the evidence presented, however, the court concludes that Defendant possessed implicit authority to keep these materials. As the creator or co-creator of the documents, Defendant was clearly authorized to access them. The evidence proves that he was instructed to and did continue to work on this project through February 13, his last day. Defendant emailed the documents to himself at his personal email address as he had previously done in order to work remotely. This may not have been an explicitly authorized practice, but other employees

also used personal email accounts for AirFacts business or worked on home computers.[7]

Defendant testified that he sent these documents to his personal email account because he was asked to be available to answer questions after he left and he wanted to be able to answer any questions that arose. Defendant believed that Plaintiff was close to signing a contract with Alaska Airlines, and testified that he felt a responsibility to the client. Although Ms. Pearson testified that she had not instructed Defendant to take copies of the documents, she had told Defendant that she and other employees would contact him if they had questions about his work. (ECF No. 71, at 24:19-25:3). As noted, this project made up approximately half of Defendant's workload in the four months before his resignation. (ECF No. 61, at 71:24-72:11). Mr. Laser also asked Defendant if he would be available to answer questions after leaving AirFacts because, based on his industry experience, "when somebody leaves . . . there is a grace period of being able to ask questions once they leave if there is anything that is outstanding or products that are incomplete[.]" (ECF No. 72, at 85:12-20). Mr. Laser did contact Defendant with questions after his departure (*id.,* at 85:21-24), as did Ms. Ying (ECF No. 64, at 137:13-21).

---

[7] When Mr. Laser contacted Defendant at his personal email address to ask him work-related questions following Defendant's departure, for example, he did so using his own personal email account. (*See* DTX 3; ECF No. 72, at 87:10-12).

The court finds Defendant's testimony to be credible.  The forensic analysis of Defendant's personal email account and computer show that he did not access the documents after the end of his employment.  (*See* DTX 7).  It is unclear why Defendant deleted the sent copy of his email, but he also used his work computer and email account to send the documents and testified that he was aware of the monitoring software on his computer. Consequently, Defendant had implicit authority to keep the documents in his personal email account, particularly given that Plaintiff's employees consulted Defendant through his personal email on substantive internal issues following his resignation. Accordingly, although the court finds that the documents Defendant emailed to himself on his last day of employment pertain to confidential information, Defendant was authorized to keep and access the documents.

###### b. Pseudocode

For Plaintiff to prove that Defendant breached section 4.2 with respect to the pseudocode, Plaintiff must prove that the pseudocode pertained to confidential information.  In October 2014, Ms. Pearson assigned two development projects to Defendant, one relating to the Fare By Rule display and the other to the SPA proration framework.  (*See* ECF No. 71, at 41:16-18).  During the final week of his employment with Plaintiff, Defendant cut and pasted pseudocode relating to the Fare By Rule display into

16

notepad, then printed the document.  (PTX 14-16).  These actions were captured by the Spector 360 monitoring software installed on Plaintiff's employees' computers.

This court determined that the pseudocode was not a trade secret.  Plaintiff did not appeal this issue, and the Fourth Circuit did not disturb this ruling.  For the same reasons, the pseudocode does not pertain to confidential information. Defendant testified that he was asked to translate ATPCO code into text, which he would do by copying column names from an ATPCO database and the text display for that information from ATPCO's Fare Manager tool into a single document.[8]  Plaintiff's programmers would then be able to use this translation document for coding. He copied and pasted the information because it was faster than retyping, and all copied and pasted information came from ATPCO. The document contained only information from ATPCO that was generally known to subscribed users of ATPCO.  Defendant did not increase the confidential nature of this document by combining information from two ATPCO sources.  The information was readily ascertainable by proper means by persons who subscribed to ATPCO

---

[8] "ATPCO" is the Airline Tariff Publishing Company, an organization that collects and distributes fare information for the airline and travel industry.  AirFacts pays a monthly subscription to ATPCO to access its data and data application, which "describe[s] how to use ATPCO data." (ECF No. 71, at 26:5-21).

in generally the same format.  Accordingly, Plaintiff has not proven that the pseudocode pertains to confidential information.[9]

### c.  Fare By Rule Flowcharts

On March 11, 2015, after his employment with AirFacts ended, Defendant retrieved two flowcharts that were part of the same Fare By Rule display project as the pseudocode and sent them to a prospective employer.  (PTX 6-7).  He retrieved them from a LucidChart online data modeling service account he had created with his work email address at the request of Ms. Pearson while working for AirFacts.  The Fourth Circuit determined that these flowcharts were trade secrets.  Section 2.1 expressly denotes trade secrets within the definition of confidential information. Because Defendant accessed these materials **after** his employment with AirFacts was terminated, however, Defendant did not breach section 4.2 (which pertains to duties upon termination of employment, but not after) with respect to the Fare By Rule flowcharts.

### d. Other Documents

Additional documents were sent by Defendant to his personal email account or stored in an AirFacts Dropbox account in 2009,

---

[9] Because the pseudocode does not pertain to confidential information, an analysis of whether Defendant breached section 2.2 with respect to these documents is not required.

2011, and 2013.  (PTX 1-4).  After the original bench trial, the court noted that

> Plaintiff's counsel stated in closing argument that Plaintiff considered these documents to be relevant to Defendant's credibility, but that it did not advance claims for their misappropriation.  The purported cost of the misappropriation of these documents was included in Plaintiff's expert's damages calculations, however.  As these documents were used by Defendant during his employment long before his resignation and not accessed or used after his employment ended, the court agrees that these documents were not disclosed to any third parties and Defendant had implicit authority to keep them.  Although Defendant's intent is not a factor for breach of contract, given AirFacts' employees' use of personal email accounts, the court finds Defendant's testimony that he simply did not recall that these documents were still in his personal email account or stored in a company Dropbox account to be credible.

(ECF No. 78, at 22 n.11).  Plaintiff does contend, nevertheless, that Defendant breached Section 4.2 of the contract by not "returning" these documents upon termination of his employment. As with the proration documents, Defendant had authority to have these documents at the time he sent them to himself via his personal email.  He simply did not recall that the documents were still stored in the email account.  There is no evidence that he accessed the documents after his employment terminated. Plaintiff's post-trial brief (ECF No. 111) recounts and identifies the testimony provided at the original trial concerning the status of these documents as containing "confidential information."

Based on that evidence, the Home Commission Table and Straight Sales Processing Diagram could constitute confidential information and Defendant was not authorized to retain the information post-employment.[10]

## 2.   Section 2.2

Plaintiff's remaining claim under section 2.2 as to the Fare By Rule flowcharts is straightforward.   Section 2.2 prohibited Defendant from "disclos[ing]" "any Confidential Information . . . unless the Employee receives specific permission in writing from the President of AirFacts[,]" "[d]uring or after" his employment with AirFacts.   (PTX 35, ¶ 2).   The Fare By Rule flowcharts are trade secrets, and thus, contain confidential information. Defendant emailed the two flowcharts to Fareportal, a prospective employer, in connection with his application.   (PTX 6-7). Defendant was not authorized to acquire or use the flowcharts as he did.   Therefore, Defendant disclosed confidential information without permission after his employment, thus violating section 2.2 of his Employment Agreement.

## B.   Count II, Maryland Uniform Trade Secrets Act Claim

Plaintiff alleges that Defendant violated the MUTSA by misappropriating trade secret information contained in several

---

[10]   Whether this breach was "material" and thus whether indemnification is available under the contract will be discussed in the Damages section of this opinion.

documents and files.  It is Plaintiff's burden to prove that the materials at issue were both trade secrets and were misappropriated.

Plaintiff originally argued four separate trade secret violations:  (1) screenshots of the TicketGuard library and upload user interface, sent by email from Defendant to Kayak on December 24, 2014, in connection with a job application (PTX 17); (2) pseudocode relating to Fare By Rule processing, which Defendant printed during his last week of employment, as captured by Spector 360 software (PTX 14-16); (3) flowcharts relating to Fare By Rule, which Defendant downloaded from LucidChart and sent by email to Fareportal on March 11, 2015, in connection with a job application (PTX 6-7); and (4) a spreadsheet relating to the Alaska Airlines proration product, which Defendant sent from his work email account to his personal email account on his final day of employment (PTX 21-23).

This court held that all alleged trade secrets were either not trade secrets or not misappropriated.  The Fourth Circuit determined, however, that the flowcharts were trade secrets.  Thus, the only remaining question is whether Defendant misappropriated the flowcharts.

"'Misappropriation' under the MUTSA is, in relevant part, '(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who' improperly acquired it or knew another person improperly or mistakenly acquired it." *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (citing Md. Code, Com. Law § 11-1201(c)).

As discussed above, Defendant retrieved the flowcharts from LucidChart — an online data modeling service account he had created while working for AirFacts.  Defendant created this account at the direction of Ms. Pearson and used his AirFacts email address to register and login.  AirFacts paid for the LucidChart account. Although the account was still active when Defendant left AirFacts, Defendant was not authorized to acquire or use the LucidChart flowcharts as he did.  Accordingly, Defendant misappropriated the LucidChart flowcharts by improperly acquiring them and disclosing them "without express or implied consent[.]"  Md. Code, Com. Law § 11-1201(c).

## IV.  Damages[11]

### A.   MUTSA Damages

The damages provision of the MUTSA states that "a complainant is entitled to recover damages for misappropriation."  Md. Code, Com. Law § 11-1203. Damages under the MUTSA include:

---

[11] Plaintiff argues, without contradiction by Defendant, that contract damages are not preempted by the MUTSA.  Plaintiff is correct that contract damages are not preempted by the MUTSA.  *See* Md. Code, Com. Law § 11-1207 ("This subtitle does not affect: (i)

> > (1) The actual loss caused by misappropriation; and
> >
> > (2) The unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.
>
> (c) In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

*Id.* Counsel conceded at trial that Plaintiff "cannot prove specific injury" (ECF No. 112, at 63), and thus only seeks reasonable royalty damages under the MUTSA (*see* ECF No. 109, at 14).[12] Plaintiff confirmed at trial that the only evidence Plaintiff relies on to prove reasonable royalty damages with respect to the Fare By Rule flowcharts is Michelle Riley's testimony. (ECF No. 112, at 65). Defendant counters, arguing that a reasonable royalty cannot be obtained unless Defendant "put the trade secret into some commercial use." (ECF No. 108, at 19). Defendant also argues that "the underlying factual basis of Riley's damage calculation is contradicted by the evidence[.]" (*Id.*).

---

Contractual remedies, whether or not based upon misappropriation of a trade secret[.]"); *First Union Nat. Bank v. Steele Software Sys. Corp.*, 154 Md.App. 97, 148 n.16 (2003).

   [12] Plaintiff unequivocally stated at trial that Plaintiff abandoned any unjust enrichment theory of damages, thus, Defendant's motion *in limine* to exclude evidence regarding TicketGuard documents and damages based upon an unjust enrichment theory (ECF No. 48) remains moot (ECF No. 78, at 35); (ECF No. 112, at 37).

Neither the Fourth Circuit nor the Maryland appellate courts have directly addressed what factors should be considered to calculate a reasonable royalty, and there are very few cases analyzing reasonable royalties elsewhere.  The leading case on calculation of a reasonable royalty in the trade secret context is *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974).  *See*, *e.g.*, *Am. Sales Corp. v. Adventure Travel*, *Inc.*, 862 F.Supp. 1476, 1479 (E.D.Va. 1994) ("There are few Virginia or Fourth Circuit cases involving the Act, but *University Computing* . . . is especially helpful with damages in determining when to consider certain factors and in defining what a 'reasonable royalty' is."); *accord Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2172502, at *3 (E.D.Va. May 10, 2018).

*University Computing* describes a flexible test that focuses on the value a defendant gains through misappropriation of a trade secret.  When a Plaintiff cannot show damages, the "approach is to measure the value of the secret to the defendant.  This is usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury."[13]  *Univ. Computing*, 504 F.2d at 536.  In such a case:

> the 'appropriate measure of damages . . . is not what plaintiff lost, but rather the

_____

[13] Many circuit courts agree with the decision of the United States Court of Appeals for the Fifth Circuit in *University*

benefits, profits, or advantages gained by the
defendant in the use of the trade secret.' . .
. [T]he law looks to the time at which the
misappropriation occurred to determine what
the value of the misappropriated secret would
be to a defendant who believes he can utilize
it to his advantage, provided he does in fact
put the idea to a commercial use.

. . .

[E]very case requires a flexible and
imaginative approach to the problem of
damages. . . . '[E]ach case is controlled by
its own peculiar facts and circumstances,' and
accordingly we believe that the cases reveal
that most courts adjust the measure of damages
to accord with the commercial setting of the
injury, the likely future consequences of the
misappropriation, and the nature and extent of
the use the defendant put the trade secret to
after misappropriation.

. . .

Certain standards do emerge from the cases.
The defendant must have actually put the trade
secret to some commercial use. The law
governing protection of trade secrets
essentially is designed to regulate unfair
business competition, and is not a substitute
for criminal laws against theft or other civil
remedies for conversion. . . . Because the
primary concern in most cases is to measure
the value to the defendant of what he actually
obtained from the plaintiff, the proper

---

*Computing* and require a plaintiff to present evidence as to "what
the parties would have agreed to as a fair price for licensing the
defendant to put the trade secret to the use the defendant intended
at the time the misappropriation took place." *Univ. Computing*,
504 F.2d at 539; *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*,
622 F.3d 361, 367 (5th Cir. 2010); *Mid-Michigan Computer Sys., Inc.
v. Marc Glassman, Inc.*, 416 F.3d 505, 510–11 (6th Cir. 2005);
*Vermont Microsys., Inc., v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d
Cir. 1996) ("A reasonable royalty award attempts to measure a
hypothetically agreed value of what the defendant wrongfully
obtained from the plaintiff.").

> measure is to calculate what the parties would
> have agreed to as a fair price for licensing
> the defendant to put the trade secret to the
> use the defendant intended at the time the
> misappropriation took place.
>
> In calculating what a fair licensing price
> would have been had the parties agreed, the
> trier of fact should consider such factors as
> the resulting and foreseeable changes in the
> parties' competitive posture; [the] prices
> past purchasers or licensees may have paid;
> the total value of the secret to the
> plaintiff, including the plaintiff's
> development costs and the importance of the
> secret to the plaintiff's business; the nature
> and extent of the use the defendant intended
> for the secret; and finally whatever other
> unique factors in the particular case which
> might have affected the parties' agreement,
> such as the ready availability of alternative
> processes.

*Id.,* at 536-39.

"The threshold requirement for obtaining reasonable royalty damages is a showing that the defendant 'actually put the trade secret to some commercial use.'" *Steves & Sons*, 2018 WL 2172502, at *8 (quoting *Univ. Computing*, 504 F.2d at 537). The Fourth Circuit has not defined commercial "use." At least one court within the Fourth Circuit has recently looked to the following definition of "use" in the trade secret context for guidance: "Employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use." *Id.* (quoting *02 Micro*

*Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1072 (N.D.Cal. 2005)).   Here, it has not been shown by a preponderance of the evidence that Defendant sought to utilize the flowcharts for a "commercial use."   Defendant did not employ the flowcharts in manufacturing, production, research or development, marketing goods that embody the flowcharts, or solicit customers through use of the trade secret.   Defendant submitted the flowcharts as part of his application to FarePortal, a prospective employer.   FarePortal is not a competitor of AirFacts.   Defendant merely included the flowcharts as an example of his work product and skill.   Defendant credibly testified that he did not believe disclosing these flowcharts revealed any of Airfacts' trade secrets; he did not send the flowcharts to any other prospective employers; and he did not use these flowcharts for their confidential information in his application.   Defendant's use of the flowcharts was not a commercial use, but rather a personal use.   There is no evidence that Defendant gave these flowcharts to FarePortal in exchange for a job.   The evidence does not support Plaintiff's conclusion that Defendant sought to undercut AirFacts' business with FarePortal.   Plaintiff admits that "FarePortal was not at the time of Defendant's disclosure a customer or competitor of AirFacts[.]" (ECF No. 109, at 16).   Further, Defendant applied to various airlines and companies within the airline industry.   He never appended the flowcharts to those applications.   Defendant

27

testified that he has never engaged in competition with AirFacts; has never helped anyone else compete with AirFacts; and that, to his knowledge, no document he took has ever been used to compete with AirFacts. Although the flowcharts contained Plaintiff's trade secrets, Defendant did not use that confidential information for a commercial use. Instead, he used the structure and style of the flowcharts to show a prospective employer his work product at its request.

Even if Defendant's inclusion of the flowcharts in his job application qualifies as a commercial use, Defendant gained little value from them. "[C]alculat[ing] what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place" is difficult in this case because Plaintiff and Defendant's reasonable royalty calculations stand in stark contrast. *Univ. Computing*, 504 F.2d at 539. Plaintiff argues for a reasonable royalty of $440,067, whereas Defendant contends that no damages should be awarded.

Plaintiff's expert, Michelle Riley, presents a generous calculation of a reasonable royalty. Ms. Riley based her calculations on the total "royalty paid to AirFacts for licenses for use of TicketGuard[,]" AirFacts' primary product. (ECF No. 107, at 19). Ms. Riley then:

> Averaged the annual fees paid for TicketGuard
> to come to a license fee for $2,165,630 for a
> two-year license and $3,248,466 for a three-
> year license. [] She then apportioned 50% of
> the fee to the library user interface
> function, which she referred to as the "front
> end" of the software, and 50% to the automated
> auditing function, which she referred to as
> the "back end" of the software. []

(*Id.*, at 19-20).  To determine a specific royalty for the Fare By

Rule Flowcharts, Ms. Riley further:

> apportioned the 50% of the total license
> dedicated to the back end/auditing process
> between the Fare Audit Flowchart and the Fare
> By Rule Flowcharts. [] She did so by looking
> at the number of tickets audited using the
> Fare By Rule, which she determined was 27.1%
> of the total number of tickets audited within
> TicketGuard.  At that point, she was able to
> determine the specific royalty attributed to
> the Fare By Rule process by multiplying the
> total average licensing fee of $3,248,466 for
> a three-year license by 50% to apportion the
> total fee to the back end, and then multiply
> that by 27.1% for the portion of the licensing
> fee attributed the Fare By Rule Flowchart, to
> come up with the reasonable royalty of
> $440,067 for a three year license[.]

(*Id.*).

Plaintiff contends that "Ms. Riley's method for determining

a reasonable royalty is in conformance with applicable case law

applied by district courts in the Fourth Circuit and other

circuits[,]" citing *University Computing*.  (*Id.*, at 21).  While

Ms. Riley does consider some of the factors suggested by *University

Computing*, she notably leaves out any factor that does not favor

a high royalty calculation for the Plaintiff.  Plaintiff considers

the value gained by Defendant only to the extent that Plaintiff believes Defendant's "intended use was to undermine AirFacts' market position." (*Id.*). This belief is not supported by caselaw, evidence, or witness testimony. Plaintiff argues that "FarePortal.com could benefit from the information to save the cost of using AirFacts' services, especially if it hired Mr. de Amezaga to interpret and apply the Flowcharts". (*Id.*). That argument, however, is directly at odds with Maryland's rejection of the inevitable disclosure doctrine in MUTSA cases. *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 320 (2004) ("No court interpreting the provisions of MUTSA has applied the theory of 'inevitable disclosure.'"). Further, Defendant points out that the flowcharts were "created by Amezaga to help AirFacts automate its processing of Fare by Rule tickets when there was missing information[.]" (ECF No. 108, at 17). Ms. Ying and Ms. Regan also testified that AirFacts was still "unable to automate the Fare by Rule ticket processing[,]" indicating that the flowcharts were of little value to AirFacts. (*Id.*). Defendant states:

> Contrary to the contention of Pearson that the flowcharts represented the entire process of Fare by Rule logic (Tr. Jan. 25 (a.m.) at 47), Li Ying, who would have been responsible for using the flowcharts at AirFacts to improve the software, testified that they only showed a small piece of Fare by Rule logic. (Tr. Jan. 27 at 144)[.] Therefore, they could not have been used by a competitor to automate the Fare by Rule ticket auditing process any more than they could help AirFacts automate that

> process.   No competitor would pay a license
> fee or royalty for a document to automate Fare
> by Rule ticket processing that could not even
> be used by AirFacts for that purpose.

(*Id.*, at 21).   This point is probative.   Ms. Ying, the director of

technical development, worked with Defendant on the ATPCO project

and was directly involved in developing and updating AirFacts'

TicketGuard auditing product.   Ms. Ying worked with the Fare By

Rules flowcharts and testified that they only show a "very small

piece" of the process and that AirFacts had "just start[ed] with

it." (ECF No. 65, at 144: 3-17).   Thus, the evidence undermines

Ms. Riley's reasonable royalty calculation.   Plaintiff has not

proven that it is entitled to a reasonable royalty as a proper

measure of damages.

### B.   Breach of Contract Damages

Plaintiff argues that the "Employment Agreement requires Mr.

de Amezaga to indemnify AirFacts for all damages, including costs

and attorney's fees, resulting from or directly arising out of a

material breach of any provision of the Employment Agreement."

(ECF No. 107, at 13).   Plaintiff requests:

> an award of attorney's fees and costs
> associated with uncovering the documents Mr.
> de Amezaga failed to return, including
> conducting the forensic analysis, identifying
> the documents that were not returned,
> identifying how Mr. de Amezaga obtained and
> retained the documents, identifying the third
> parties to whom the documents were
> transferred, assessing and mitigating the
> damage caused by Mr. de Amezaga taking the

documents, and the cost of the experts preparing and presenting the reports at trial.

(*Id.*). Defendant asserts that "AirFacts has no claim for damages because it suffered no damages as a result of Amezaga sending the two flowcharts to FarePortal." (ECF No. 108, at 11).

The Employment Agreement contains an indemnification provision:

> 6.1
>
> Employee shall defend, indemnify and hold harmless AirFacts, its officers, directors, employees and clients from any losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and reasonable attorney's fees) resulting from or directly or indirectly arising out of any material breach of any material provision of this Agreement by Employee.

(PTX 35, ¶ 6.1).

Defendant breached the Employment Agreement by retaining some confidential documents and obtaining and misappropriating trade secrets and confidential information. The question remains, however, whether the breaches were "material." The contract does not define the term. Under Maryland law, a "breach is material 'if it affects the purpose of the contract in an important or vital way.' *Sachs v. Regal Sav. Bank, FSB,* 119 Md.App. 276, 705 A.2d 1, 4 (1998)." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005). Williston on Contracts provides the following discussion:

The courts have come up with numerous ways of speaking about "material" breaches of contract. Thus, it has been said that a "material breach" is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. In other words, for a breach of contract to be material, it must "go to the root" or "essence" of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract, or affect the purpose of the contract in an important or vital way. A breach is "material" if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract. Other courts have defined a breach of contract as "material" if the promisee receives something substantially less or different from that for which the promisee bargained. In many cases, a material breach of contract is proved by the established amount of the monetary damages flowing from the breach; however, proof of a specific amount of monetary damages is not required when the evidence establishes that the breach was so central to the parties' agreement that it defeated the essential purpose of the contract. Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be "material."

23 *Williston on Contracts*, § 63:3. (4th Ed. 2002)(footnotes omitted).

While the contractual provisions in Sections 2.2 and 4.2 were material, the breaches themselves were not. They were de minimus.

33

The retention of the old documents was entirely without consequence.  The disclosure of the flowcharts is a somewhat closer question, but still not material.  This disclosure did not cause harm to Plaintiff and was but a minor, technical, violation of the contract.  The breaches caused no actual damages and no prejudice.  Plaintiff only prevailed on proving that Defendant breached the Employment Agreement as to the flowcharts, home commission table, and straight sales processing diagram.  Plaintiff did not prove a breach with respect to the proration framework, database models, TicketGuard screenshots, or pseudocode.  Plaintiff admits that it cannot prove specific injury as to breach of contract, and only seeks indemnification for fees and costs.  But that measure of damages is only available for a material breach of a material provision.  Materiality has not been proven.  Accordingly, Plaintiff is only entitled to nominal damages for breach of contract.

**V.   Conclusion**

For the foregoing reasons, judgment will be entered in favor of Plaintiff and against Defendant for $1.00.  A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
