IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AIRFACTS, INC.                           :

                                         :

    v.                                   :   Civil Action No. DKC 15-1489

                                         :

DIEGO DE AMEZAGA

## MEMORANDUM OPINION

This action is again before the court to adjudicate the claims of Plaintiff AirFacts, Inc., against Defendant Diego de Amezaga for breach of contract and trade secret misappropriation. This court previously entered judgment for Plaintiff on its breach of contract claim and awarded nominal damages, but denied Plaintiff's request for royalty damages on the trade secret misappropriation claim. (ECF Nos. 113, 114). On appeal, the United States Court of Appeals for the Fourth Circuit affirmed in part, reversed in part, and vacated in part. The case was remanded to this court to decide: (1) whether Defendant "material[ly]" breached his employment contract and "if so, what (if anything) [Plaintiff] is owed" in damages for that breach, and (2) "what (if anything) [Plaintiff] deserves in reasonable royalty damages" on its trade secret misappropriation claim. *AirFacts, Inc. v. Amezaga*, 30 F.4th 359, 367, 369 (4th Cir. 2022).

Currently pending is Plaintiff's Motion for Other Relief (ECF No. 122). The issues have been briefed, and the court now rules,

no additional hearing being necessary.  Local Rule 105.6.  On Plaintiff's breach of contract claim, the court will enter judgment for Plaintiff and award nominal damages because Defendant did breach the contract, but not in a material way.  On Plaintiff's trade secret misappropriation claim, the court will enter judgment for Defendant because Plaintiff has not met its burden to prove damages in the form of a fair licensing price for the Defendant's use of the misappropriated trade secrets.  The following findings of fact and conclusions of law are issued pursuant to Fed.R.Civ.P. 52(a).[1]

## I.  Background

This section contains only a brief summary of the facts and procedural history relevant to this opinion.  A more extensive recitation of the background can be found in prior opinions.  (ECF Nos. 78, 113); *AirFacts, Inc. v. de Amezaga*, No. 15-cv-1489-DKC,

---

[1] Under Rule 52(a), "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  To comply with this rule, the court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F.Supp.2d 769, 772 (W.D.Va. 2008) (quoting Fed.R.Civ.P. 52(a) advisory committee's note to 1946 amendment).  Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court[,] they are sufficient." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

2017 WL 3592440 (D.Md. Aug. 21, 2017); *AirFacts, Inc. v. de Amezaga*, 502 F.Supp.3d 1027 (D.Md. 2020).

A.   **Factual Background**

AirFacts develops and licenses revenue accounting software for airlines.  (ECF No. 61, at 30:8-13).  Its primary product is TicketGuard, a software that audits travel agencies' plane ticket sales by comparing the price at which a travel agency sells an airline's tickets to the airline's required price, as determined by commissions, taxes, and industry rules.  (ECF No. 61, at 29:12-15, 30:8-13, 31:3-23. 32:1-11).

Defendant Diego de Amezaga began working at AirFacts in June 2008.  (ECF No. 61, at 87:3-4).  Around that time, the parties executed an "Employment Agreement," which required Mr. de Amezaga to indemnify AirFacts for "material" breaches of the agreement. (PTX 35).[2]  While at AirFacts, Mr. de Amezaga worked to develop and pitch a new "proration" software.  (ECF No. 61, at 72:5-11, 115:5-6).  The software would help airlines ensure they receive the appropriate share of a multi-airline ticket sale.  (ECF No. 61, at 46:16-23).  In a prior opinion, the court found that:

> Plaintiff has also attempted to develop a
> proration software product to assist airlines
> in receiving revenue that accurately reflects
> industry standards and negotiated rates, which

---

[2] "PTX" refers to exhibits offered by Plaintiff at trial, and "DTX" refers to exhibits offered by Defendant.  References to trial testimony are designated by the ECF docket entry of the official transcript and page number where available.

are recorded in special prorate agreements
("SPAs"), when two or more airlines share
ticket revenues in a single transaction.
Plaintiff first began working
"intermittently" and "sporadically" on a
proration product in 2012 (ECF No. 61, at
70:25-71:9, 71:18-23), and entered into a
contract with Alaska Airlines to develop a
proration product on June 1, 2015 (PTX 172).
Although [AirFacts' CEO April Pearson]
testified that Plaintiff had "a complete and
finished product" that Plaintiff's airline
client was evaluating at the time of the
January 2017 trial, Plaintiff did not yet have
a proration product in use. (See ECF No. 66,
at 128:5-15).

(ECF No. 78, at 2-3).

More specifically, the court found:

The proration product is [at the time of
the 2017 trial] under development for Alaska
Airlines pursuant to a contract Plaintiff
entered into on June 1, 2015. (PTX 172).
Alaska Airlines first approached Plaintiff
about developing a proration product in 2012,
and Plaintiff had worked on it "sporadically"
and "intermittently" since that time. (ECF No.
61, at 71:1-5, 20-23). Ms. Pearson testified
that Plaintiff's proration product
development "really started in earnest in
2014," and that Defendant spent approximately
half of his time working on the product
between October 2014 and his resignation in
February 2015. (*Id.* at 71:20-72:11). Defendant
testified that, at the time of his
resignation, Plaintiff was in the midst of
working out a contract with Alaska Airlines
for a proration product, and that he alone had
been working on material pieces of the
potential product. Although Plaintiff did not
enter into a contract for the development of
the proration product until after Defendant's
resignation, the court concludes that the
proration product was anticipated at that

> time, and that Defendant had material
> knowledge of the anticipated product.

(ECF No. 78, at 16-17).

Mr. de Amezaga resigned from AirFacts in February 2015. (ECF No. 61, at 110:13-14). On his last day, he sent documents related to the new proration software to his personal email account because his superiors told him they may reach out with questions about his work. (ECF No. 71, at 12:18-25, 13:1); (ECF No. 94, at 34:11-25). In an earlier opinion, this court found:

> Defendant testified that he sent these [proration] documents to his personal email account because had been asked to be available to answer questions after he left and he wanted to be able to answer any questions that arose. Defendant believed that Plaintiff was close to signing a contract with Alaska Airlines, and testified that he felt a responsibility to the client. Although Ms. Pearson testified that she had not instructed Defendant to take copies of the documents, she had told Defendant that she and other employees would contact him if they had questions about his work. (ECF No. 71, at 24:19-25:3). As noted, this project had made up approximately half of Defendant's workload in the four months before his resignation. (ECF No. 61, at 71:24-72:11). Mr. Laser also asked Defendant if he would be available to answer questions after having left AirFacts because, based on his industry experience, "when somebody leaves . . . there is a grace period of being able to ask questions once they leave if there is anything that is outstanding or products that are incomplete[.]" (ECF No. 72, at 85:12-20). Mr. Laser did contact Defendant with questions after his departure (*id.* at 85:21-24), as did Ms. Ying (ECF No. 64, at 137:13-21).

5

> The court finds Defendant's testimony to be credible. The forensic analysis of Defendant's personal email account and computer show that he did not access the documents after the end of his employment. (See DTX 7). Use or disclosure of a trade secret is not required to prove misappropriation, but this evidence lends credibility to Defendant's testimony that he took copies of the documents only in case he needed them to answer questions from Plaintiff's employees, which he ultimately did not.

(ECF No. 78 at 32-34).

About one month after he left, he applied for a job with Fareportal, a travel agency. (PTX 8). Fareportal is not AirFacts' competitor or customer, but TicketGuard is used to audit tickets sold by Fareportal. (ECF No. 72, at 18:2-9). As part of that application, Mr. de Amezaga emailed to Fareportal two flowcharts which he had created for AirFacts. (PTX 6-7). He downloaded the flowcharts from an online document-storage service using his AirFacts employee credentials. (ECF No. 71, at 45:10-16). Mr. de Amezaga says he only sent Fareportal the flowcharts to help them understand the work he did for AirFacts. (ECF No. 94, at 23:11-18). Fareportal did not hire Mr. de Amezaga. (ECF No. 94, at 26:25, 27:1). On May 11, 2015, he began working at American Airlines as a senior manager in the Refunds department. (ECF No. 94, at 44:11-13).

**B.   Procedural Background**

On May 22, 2015, AirFacts sued Mr. de Amezaga, raising claims for breach of contract, misappropriation of trade secrets under the Maryland Uniform Trade Secrets Act ("MUTSA"), and conversion. (ECF No. 1).  About one month later, Mr. de Amezaga gave the forensic investigator for AirFacts access to all his personal devices.  By the end of June 2015—about one month after this suit was filed—AirFacts had collected, identified, and deleted all company documents that Mr. de Amezaga had retained after leaving the job.  (ECF No. 64, at 71:9-17, 101:19-24).  The company also found that Mr. de Amezaga had not accessed those documents since leaving AirFacts, except to send the flowcharts to Fareportal for his job application. (DTX 7); (PTX 10); (ECF No. 64, at 84:1-2).

After a bench trial, this court entered judgment in favor of Mr. de Amezaga on all counts.  (ECF No. 79).  AirFacts appealed, and in *AirFacts I*, the United States Court of Appeals for the Fourth Circuit affirmed in part and vacated in part.  *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84 (4th Cir. 2018).  It remanded for this court to consider whether Mr. de Amezaga had breached several clauses in the Employment Agreement related to confidential information and to decide whether Mr. de Amezaga had violated MUTSA by sending the flowcharts to Fareportal, which the Fourth Circuit held were trade secrets.  *Id.* at 93, 97.

On remand, this court held that Mr. de Amezaga did breach his employment contract by sending the flowcharts to Fareportal and by retaining certain sales and commission documents after leaving AirFacts, but that these breaches were "de minimis."  (ECF No. 113, at 33).  And because the employment contract limited AirFacts' right to recover damages, fees, and costs to those caused by "material" breaches, the court awarded only nominal damages.  (ECF No. 113, at 34).  The court also found that Mr. de Amezaga did not breach the contract by emailing the proration documents to his personal account.  (ECF No. 113, at 16).  As for the MUTSA claim, this court found that Mr. de Amezaga misappropriated trade secrets—the flowcharts—because he improperly acquired and disclosed the documents without consent.  (ECF No. 113, at 22).  But the court denied AirFacts' requested royalty damages, relying in part on case law which stated that royalty damages are appropriate only when a defendant puts a trade secret to "commercial use."  (ECF No. 113, at 24-28) (quoting *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536-39 (5th Cir. 1974)).

AirFacts again appealed, and in *AirFacts II*, the Fourth Circuit affirmed in part, reversed in part, and vacated in part. *AirFacts, Inc. v. Amezaga*, 30 F.4th 359 (4th Cir. 2022).  It affirmed this court's holding that Mr. de Amezaga did not materially breach the contract by emailing the flowcharts to Fareportal and retaining the sales and commission documents,

8

reasoning that there is "no evidence" these actions "harmed or prejudiced AirFacts." *Id.* at 364. But it reversed this court's holding that Mr. de Amezaga did not breach the contract by emailing the proration documents to himself; it held that this act was a breach of contract, and it remanded to this court to determine "whether this breach was material and, if so, what (if anything) AirFacts is owed under the agreement's indemnification clause." *Id.* at 367. It also vacated this court's ruling in favor of Mr. de Amezaga on the MUTSA claim because it held that MUTSA does not require a plaintiff to prove that a defendant put trade secrets to commercial use. *Id.* The Fourth Circuit thus remanded for this court to "decide what (if anything) AirFacts deserves in reasonable royalty damages" on its MUTSA claim. *Id.* AirFacts then filed a Motion for Other Relief, (ECF No. 122), and Mr. de Amezaga responded, (ECF No. 125).

## II.  Findings of Fact and Conclusions of Law

In its Motion for Other Relief, AirFacts requests: (1) $85,752 in breach of contract damages based on Mr. de Amezaga's retention of the proration documents after he left AirFacts, and (2) $50,000 in reasonable royalty damages under the Maryland Uniform Trade Secrets Act. (ECF No. 122, at 27). Both requests will be denied.

### A.  Breach of Contract Damages

Mr. de Amezaga's employment agreement requires him to indemnify AirFacts only for a "material" contract breach. (PTX

9

35).   A breach is "material" if it "affects the purpose of the
contract in an important or vital way."  *Sachs v. Regal Sav. Bank*,
119 Md.App. 276, 283 (1998).   A breach is not material if it
"causes no damages or prejudice" to the non-breaching party.
*AirFacts, Inc. v. Amezaga* (*AirFacts II*), 30 F.4th 359, 364 (4th
Cir. 2022) (quoting 23 *Williston on Contracts*, § 63:3 (4th ed.
2021)).

At earlier stages in this litigation, AirFacts claimed that
Mr. de Amezaga materially breached the employment agreement in
several ways, including by sending flowcharts to Fareportal, by
keeping certain commission and sales documents after his
employment ended, and by emailing proration documents to his
personal email address on his last day at AirFacts.  Most of those
claims have now failed. Earlier this year, the Fourth Circuit
affirmed this court's holding that Mr. de Amezaga breached the
contract by disclosing the flowcharts and keeping the commission
and sales documents but that these breaches were not material
"because there's no evidence [these actions] harmed or prejudiced
AirFacts."  *Id.*

Thus, the only contract claim that now remains is the one
related to Mr. de Amezaga's decision to email the proration
documents to his personal account.  The Fourth Circuit held that
Mr. de Amezaga breached the contract "by retaining the proration
documents after he left AirFacts."  *Id.* at 367.   The Fourth

10

Circuit's holding, however, went "no further." *Id.* Instead, it remanded so that this court could "determine . . . whether this breach was material and, if so, what (if anything) AirFacts is owed." *Id.*

Having reviewed the record in light of the Fourth Circuit's holding, the court finds that Mr. de Amezaga did not materially breach the contract by emailing the proration documents to himself and retaining them because AirFacts has not proven that this act caused it any "harm[] or prejudice[]." *Id.* at 364. AirFacts raises two theories to explain why the retention of the proration documents was a material breach. First, it argues that the documents included confidential information about Alaska Airlines— a customer who had signed a contract to purchase AirFacts' proration software. (PTX 172). According to AirFacts, when the Airline learned that Mr. de Amezaga had emailed this information to his personal account, it "required AirFacts, as a condition to sale, to redevelop and modify the Proration software to overcome the data breach" and "did not move forward with the purchase, even though the product is ready to go." (ECF No. 122, at 10). Thus, AirFacts argues, Mr. de Amezaga should compensate AirFacts for its "redevelopment" expenses. (ECF No. 122, at 10). Second, AirFacts argues that the breach was material because it forced AirFacts to hire lawyers and fund a "forensic investigation" to recover the documents Mr. de Amezaga improperly retained. (ECF No. 122, at

11

12).   Under either theory, AirFacts fails to meet its burden to
prove a material breach.

First, the record does not support AirFacts' assertion that
Alaska Airlines "required AirFacts, as a condition to sale, to
redevelop and modify the Proration software to overcome [Mr. de
Amezaga's] data breach." (ECF No. 122, at 10).   Indeed, AirFacts
presented no evidence at trial that the Airline ordered—or even
*asked*—AirFacts to redevelop its proration software.   When
AirFacts' CEO, April Pearson, was asked at trial to explain how
Mr. de Amezaga's data breach impacted AirFacts' relationship with
the Airline, she explained that the breach created "an
uncomfortable situation" and that the Airline asked AirFacts "to
sign an additional NDA to reassure them and cover the things that
were taken." (ECF No. 71, at 11:14-25, 12:1).   But she never said
that the Airline ordered AirFacts to redevelop its proration
software as "a condition" to finalizing the sale, as AirFacts now
claims.[3]

And however "uncomfortable" the Airline may have been with
the data breach, the record suggests that the breach did little to
hinder the companies' sales relationship.   Indeed, AirFacts and

---

[3] (*See also* ECF No. 66, at 29:18-25, 30:1-9) (when asked to
clarify "any other way" in which the Airline reacted to the data
breach besides asking AirFacts to sign an NDA, Ms. Pearson said
only that the breach "made it awkward" to interact with the Airline
and once again said nothing about the Airline mandating or
requesting redevelopment).

Alaska Airlines consummated a sales contract in June 2015—one month after AirFacts sued—and held a "Proration System Kickoff Meeting" in August 2015—two months after AirFacts had recovered and deleted the documents Mr. de Amezaga emailed to himself.  (PTX 172); (DTX 9).[4]  AirFacts presented no evidence that the Airline required it do anything to cure Mr. de Amezaga's data breach besides signing an "additional NDA."  (ECF No. 71, at 11:24-25).

While Ms. Pearson did testify that AirFacts chose to redevelop its proration software after Mr. de Amezaga left, the record shows that this was an independent business decision that was neither mandated by a customer nor caused by Mr. de Amezaga's temporary retention of the proration documents.  Indeed, AirFacts began redevelopment in late 2015, (see ECF No. 66, at 27:16-20) (Ms. Pearson explained that the redevelopment occurred over "three to fourth months," starting in December 2015 and ending in February 2016)—nearly six months after AirFacts recovered and deleted the documents Mr. de Amezaga emailed to himself, and after a forensic investigation confirmed that he had not accessed those documents since sending that email.  (DTX 7).  At that point, AirFacts had

---

[4] Soon after AirFacts sued, Mr. de Amezaga gave the forensic investigator for AirFacts access to all his personal devices.  That investigator testified at trial that by June 2015, AirFacts had "collected," "identified," and "deleted" all proration documents that Mr. de Amezaga improperly retained.  (ECF No. 64, at 71:9-17, 101:19-24).  The investigator likewise found that since leaving AirFacts, Mr. de Amezaga had not once accessed those documents. (DTX 7; PTX 10); (ECF No. 64, at 84:1-2).

no reason to believe that Mr. de Amezaga had any confidential client information in documentary form, let alone that he had given that information to his new employer.

Yet AirFacts chose to redevelop its proration software anyway in part because Ms. Pearson wanted to ensure that the software was "truly unique" and that it did not share the "same structure" as anything Mr. de Amezaga might create in his new job. (ECF No. 66, at 28:2-8). Based on that testimony, it seems that the redevelopment was spurred more by Mr. de Amezaga's decision to take a job at a company in the airline industry—an act that "did not breach" his employment contract, *see AirFacts, Inc. v. de Amezaga* (*AirFacts I*), 909 F.3d 84, 94 (4th Cir. 2018)—than by his temporary retention of a few since-deleted documents. Thus, whatever harm the redevelopment process caused AirFacts, that harm cannot reasonably be attributed to the action that constituted the breach of contract—that is, Mr. de Amezaga's decision to email the documents to his personal account and retain them briefly.

What is more, it is unlikely that Alaska Airlines would seek redevelopment as a solution to the data breach because redevelopment would do nothing to protect the breached data. Mr. de Amezaga's retention of the proration documents concerned the Airline because those documents contained "active, bilateral contracts," the details of which the Airline preferred not to be disseminated. (ECF No. 66, at 28:18-25, 29:1-7). But AirFacts'

redevelopment involved "redo[ing]" the proration software's "framework," not changing the information that framework contained. (ECF No. 66, at 30:21-25). Even after redevelopment, AirFacts' proration software contained the same "active, bilateral contracts" that the Airline sought to protect, and redeveloping the software did nothing to change the fact that Mr. de Amezaga had (briefly) retained documents containing the contract information. Redevelopment would thus do little to quell the Airline's security concerns. That fact bolsters the conclusion that redevelopment was likely spurred not by a customer's mandate to remedy a data breach, but rather by an independent choice to change the software's "structure" so that it remained "unique" after an important employee lawfully took his skills elsewhere. (ECF No. 66, at 28:2-8).[5]

Nor does the record support AirFacts' assertion that the data breach caused Alaska Airlines to choose "not [to] move forward with the purchase" of the proration software. (ECF No. 122, at 10). In fact, Plaintiff's argument is based on a confused interpretation of the timeline. The Airline contracted to buy

---

[5] Ms. Pearson also conceded on cross examination that "the development schedule" for the Alaska Airlines proration project "started in August 2015"—nearly three months *after* Mr. de Amezaga left AirFacts. (ECF No. 66, at 129:6-14). Thus, the work AirFacts did on the proration software after Mr. de Amezaga went to American Airlines could more accurately be called "development" rather than "redevelopment."

that software in June 2015—four months after Mr. de Amezaga had emailed the documents to himself, one month after he started working at American Airlines, and just a few weeks before AirFacts had assured itself that Mr. de Amezaga had done nothing with the documents he briefly retained.  Nothing in the record suggests that the Airline reneged on this agreement, much less that it did so because of Mr. de Amezaga.  Indeed, to support its assertion, AirFacts relies mainly on Ms. Pearson's testimony that AirFacts' proration software was-at the time of trial in 2017-"ready to go and waiting on implementation by Alaska Airlines."  (ECF No. 61, at 77:22-23).  But in her very next answer, Ms. Pearson clarified that the implementation was delayed because the Airline was involved in a "merger," and thus was "preoccupied with other things at the moment"—Mr. de Amezaga had nothing to do with it.  (ECF No. 61, at 78:1-2).  The record does not support AirFacts' sweeping claims about the damage that Mr. de Amezaga purportedly caused to the company's sales relationship with Alaska Airlines.  It has not shown that the breach of retaining proration documents was material based on any redevelopment costs.

Second, AirFacts argues that Mr. de Amezaga materially breached the contract because the company hired lawyers and funded a forensic investigation to track down the documents he improperly retained.  (ECF No. 122, at 12).  But AirFacts already raised the same argument on appeal, and the Fourth Circuit rejected it.  This

16

argument, the Fourth Circuit reasoned, "is circular." *AirFacts II*, 30 F.4th at 365. "It can't be that to recover fees and costs, the breach must be material, and that the breach is material because AirFacts incurred fees and costs." *Id.* Indeed, if "legal fees and forensic costs incurred in . . . litigation" were enough to make a breach material, then a party could "transform any immaterial breach into a material one simply by resorting to litigation," effectively nullifying the material breach requirement. *See id.* (holding that the employment contract cannot be interpreted in a way that "render[s] the material-breach requirement superfluous"); *cf. Owens-Illinois, Inc. v. Cook*, 386 Md. 468, 497 (2005) (explaining that Maryland courts construe contracts to "giv[e] effect to every clause and phrase, so as not to omit an important part of the agreement").[6]

### B.   MUTSA Royalty Damages

Under the Maryland Uniform Trade Secrets Act ("MUTSA"), a plaintiff may obtain damages as a "statutory remed[y]" for the defendant's "misappropriation of a trade secret." *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 304 (2004). Here, AirFacts has proven that Mr. de Amezaga misappropriated a trade secret—the

---

[6] AirFacts also requests a hearing to develop more evidence regarding its "attorney's fees and forensic expenses." (ECF No. 122, at 16). Because no amount of added evidence related to these costs can "transform [Mr. de Amezaga's] immaterial breach into a material one," *see AirFacts II*, F.4th at 365, that request will be denied.

flowcharts "are trade secrets," and "by disclosing the flowcharts to Fareportal, [Mr. de Amezaga] misappropriated those trade secrets." *AirFacts II*, 30 F.4th at 368 (internal citations omitted). But to obtain MUTSA damages, a plaintiff must also provide evidence of "damages caused by misappropriation." Md. Code Com. Law § 11-1203(a)-(c). MUTSA permits a plaintiff to obtain damages in one of three ways: (1) by proving an "actual loss," (2) by proving "unjust enrichment," or (3) by establishing "a reasonable royalty for [the defendant's] unauthorized . . . use." *Id.*

Here, AirFacts seeks only "reasonable royalty" damages. "Case law addressing royalty damages for misappropriating trade secrets is sparse." *AirFacts II*, 30 F.4th at 367. The "leading case," *see id.*, is *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974). There, the United States Court of Appeals for the Fifth Circuit held that a reasonable royalty damage should reflect "a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Id.* at 539. To determine that fair price, a court must conceive a "hypothetical royalty negotiation" between the plaintiff and the defendant and then "estimate the [license] fee" to which the parties would have agreed after negotiating. *StorageCraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1187-88 (10th Cir. 2014). And because "in any licensing

negotiation . . . many considerations can come into play when setting a price," a number of factors are relevant when calculating royalty damages. *Id.* at 1189.

In particular, *University Computing* instructs courts to consider: (1) "the resulting and foreseeable changes in the parties' competitive posture," (2) "th[e] prices past purchasers or licensees may have paid," (3) "the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business," (4) "the nature and extent of the use the defendant intended for the secret," and (5) "other unique factors in the particular case which might have affected the parties' agreement."  504 F.2d at 539. This analysis "requires a flexible and imaginative approach," *id.* at 538—indeed, "some of these factors aren't relevant to every case," so a court must "identify[] the ones that are most pertinent in the particular circumstances at hand." *StorageCraft*, 744 F.3d at 1189.

Because AirFacts bears the "burden of proving damages," *see University Computing*, 504 F.2d at 545, it can only obtain damages if it provided at trial "proof . . . sufficient to establish a reasonable royalty," *see Check 'n Go of Va., Inc. v. Laserre*, No. Civ.A.6:04 CV 00050, 2005 WL 1926609, at *2 (W.D.Va. Aug. 9, 2005)— that is, if it established a fair licensing price for the act of sending the flowcharts to Fareportal.  In its opinion remanding

19

this case, the Fourth Circuit instructed this court to consider the *University Computing* factors to "determine what a fair licensing price for the flowcharts would have been." *AirFacts II*, 30 F.4th at 369 (cleaned up).  Following that approach, this court finds that AirFacts has not proven that there is any fair licensing price for Mr. de Amezaga's disclosure of the flowcharts.  An analysis of each *University Computing* factor follows.

### 1.   Changes in Competitive Posture

The first *University Computing* factor is "the resulting and foreseeable changes in the parties' competitive posture."  504 F.2d at 539.  This factor favors royalty damages when a misappropriated trade secret gives the plaintiff's "competitor . . . a commercial advantage" or puts the plaintiff at a "competitive disadvantage." *See id.* at 542.  By contrast, royalty damages may be inappropriate where the defendant discloses a secret to a party that "didn't [or] couldn't make use of [it] and who therefore couldn't do serious damage" to the plaintiff's market position. *See Storagecraft*, 744 F.3d at 1189.

Here, this factor weighs against royalty damages because AirFacts has not shown that disclosure of the flowcharts changed AirFacts' competitive posture.  It has been more than seven years since Mr. de Amezaga sent flowcharts to Fareportal as part of a job application.  And yet, AirFacts has not shown that Fareportal used the flowcharts at all in those seven years.  It did not prove,

for example, that Fareportal created its own ticket auditing software to compete with TicketGuard. Rather, AirFacts remains a unique company filling a unique role within the airline industry, and Fareportal remains a different company serving a different role. (ECF No. 61, at 28: 13-14) (AirFacts audits third party ticket sales); (ECF No. 71, at 37:6-8) (FarePortal is a travel agency). The two companies did not compete before Mr. de Amezaga's disclosure, and they do not compete now. (ECF No. 122, at 22) ("Fareportal [i]s not an existing competitor . . . of AirFacts."). Nothing has changed.

Indeed, this case differs from other cases in which federal courts awarded royalty damages based in part on changes in competitive posture. For instance, the United States Court of Appeals for the Sixth Circuit found that royalty damages were appropriate where the plaintiff's competitor used trade secrets "to create a panoply of new products, save significantly on time and resources devoted to research, and streamline [its] manufacturing processes." *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 Fed.App'x. 479, 486 (6th Cir. 2002). Another district court in this circuit awarded royalty damages where the plaintiff's competitor used proprietary information to enter the market at an "unusually swift speed," thus decreasing the "volume and profitability" of the plaintiff's products. *Sonoco Products Co. v. Guven*, No. 4:12-cv-00790-BHH, 2015 WL 127990, at *9 (D.S.C.

21

Jan. 8, 2015).[7]   In those cases, the plaintiff's competitive posture changed because a competitor actually *did something* with the plaintiff's trade secrets, like recreating the plaintiff's product, creating a competing product, or bringing a competing product to the market faster.  But here, AirFacts has not shown that Fareportal did *anything* with the flowcharts.[8]

As the Fourth Circuit noted earlier this year, "there's no evidence" that Mr. de Amezaga's disclosure of the flowcharts "harmed or prejudiced AirFacts."  *AirFacts II*, 30 F.4[th] at 364. The Fourth Circuit relied on that finding in evaluating a breach of contract issue, but it applies with similar force to the first *University Computing* factor.  If disclosure of the flowcharts had negatively impacted AirFacts' competitive posture, then it would no doubt have "harmed or prejudiced AirFacts."  *Id.*  But this court already found—and the Fourth Circuit affirmed—that no such harm occurred.

Seemingly acknowledging that disclosure of the flowcharts has not yet "result[ed]" in any changes to its competitive posture,

---

[7] *See also Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510-12 (6th Cir. 2005) (holding that royalty damages were appropriate because plaintiff's competitor used trade secrets to "reconstruct [plaintiff's] protected source code" and thus "save research and manufacturing resources").

[8] (*See* ECF no. 72, at 20:11-16) (when asked whether AirFacts had any evidence that "Fareportal or anyone else used [the flowcharts]," Ms. Pearson answered, "I don't know what Fareportal did with them.  I don't have any evidence, no.").

*see University Computing*, 504 F.2d at 539, AirFacts instead posits several ways in which Fareportal could use the flow charts to "undermine AirFacts' market position" in the future. (ECF No. 122, at 22). First, AirFacts argues that Fareportal could "become a competitor," presumably by using the flowcharts to create a product that competes with TicketGuard. (ECF No. 122, at 22). That argument is unpersuasive for a few reasons. To start, the Court of Appeals of Maryland has held that courts applying MUTSA generally should not "infer" that a party "will use or disclose [a] trade secret[]" simply because it has been "expos[ed]" to that secret. *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 316, 322, (2004).[9] And even if such an inference is proper when a secret is disclosed to a competitor, it is far less so when a secret is disclosed to a non-competitor. *See Storagecraft*, 744 F.3d at 1189 (reasoning that royalties are appropriate where secrets are

---

[9] In *LeJeune*, a MUTSA plaintiff sought an injunction rather than royalty damages. 381 Md. at 299. But the Court of Appeals' reasoning applies with similar force to MUTSA damages claims. The court explained that MUTSA "provides the statutory remedies for a business alleging misappropriation of a trade secret" and that such remedies include both "damages and injunctive relief." *Id.* at 301, 304. The court then held that a MUTSA remedy should not rest on the "inference" that a party will use trade secrets merely because it has been "expos[ed]" to them. *Id.* at 322. That improper inference, the court reasoned, violates Maryland's "policy in favor of employee mobility." *Id.* AirFacts' damages theory—that it should receive a greater royalty because Fareportal has been "expos[ed]" to the flow charts and will thus competitively use them—rests on the same improper inference and implicates similar policy concerns.

disclosed to "an able competitor," thus encouraging "commercial exploitation by [a] rival," but may be inappropriate where secrets were instead disclosed to a party that "didn't . . . make use of the[m]").

What is more, even if Fareportal wanted to create a product that competes with TicketGuard, AirFacts has not shown that the flowcharts would offer much help in that endeavor.  Indeed, the flowcharts themselves are not even part of the TicketGuard software.  Rather, as AirFacts' director of technical development testified, they merely show a "very small piece" of the ticket auditing process.  (ECF No. 64, at 142: 23-35).  And the flowcharts themselves were meant in part to help AirFacts conduct its "Fare by Rule audits . . . in an automated way," (see ECF No. 72, at 72:15-25, 73:1-8)—something that AirFacts still cannot do.  (ECF No. 122, at 21) (acknowledging that AirFacts' Fare by Rule process has still "not been automated").  If AirFacts itself has been unable to use the flow charts to accomplish the very thing for which they were created, Fareportal likely could not use them for much more.  All told, this factor is concerned with "foreseeable" competitive changes—not with any imaginable future outcome. *University Computing*, 504 F.2d at 539.  And AirFacts has provided no evidence that the flowcharts by themselves could foreseeably spur Fareportal to create software it has never made so that it can enter a market in which it has never competed.

24

Second, AirFacts argues that Fareportal was a "potential customer" of AirFacts—that is, Fareportal might have bought AirFacts' auditing services itself, but now it can presumably use the flowcharts instead and thus "save the cost of using AirFacts' services." (ECF No. 122, at 22-23). That argument finds no support in the record. To start, the flowcharts themselves do not replace AirFacts' services—they are "basic logic diagrams" that show how an auditor would handle incorrectly entered passenger information. (ECF No. 94, at 23:19-25, 24:1-8). What is more, the assertion that Fareportal could be a "potential customer," (ECF No. 122, at 23), seems to get AirFacts' business model backwards. As Ms. Pearson testified, AirFacts is "hired by *airlines*" to ensure that travel agencies sell plane tickets "for the right price." (ECF No. 61, at 28: 13-14) (emphasis added). Thus, airlines hire the company to audit travel agencies. Fareportal is a travel agency, not an airline, so it would not be an AirFacts customer.

Third, AirFacts argues that Fareportal is "regularly subject to [AirFacts'] audits," so it could use the flowcharts to evade those audits and reduce the audits' value to AirFacts' customers. (ECF No. 122, at 23). But AirFacts has not proven that the flowcharts would help Fareportal do anything like that. AirFacts' audits are meant to identify situations in which travel agencies charge the wrong prices for an airlines' tickets. (ECF No. 61, at

25

28: 13-14, and 29:12-15).   So to evade an audit, a travel agency would need to "have access to the airline's actual fares" and "modify those . . . in some way." (ECF No. 94, at 25:16-20).   The flowcharts do not do that; they merely show the process an AirFacts' auditor would follow when auditing a ticket involving incorrectly entered passenger information.   (ECF No. 94, at 23:19-25, 24:1-8).   AirFacts has not explained how Fareportal could use that knowledge to undermine or evade an audit in any way.

### 2.   Past Licenses

The second *University Computing* factor is "th[e] prices past purchasers or licensees may have paid."   504 F.2d at 539.   In weighing this factor, a "district court must consider licenses that are commensurate with what the defendant has appropriated." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011) (internal quotations omitted).   Otherwise, a plaintiff could "inflate" the royalty by "conveniently select[ing]" high-value licenses "without an economic or other link to the technology in question."   *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010).   A plaintiff thus cannot meet its burden to prove a reasonable royalty by providing evidence only of past licenses that were "directed to a vastly different situation than the hypothetical licensing scenario of the present case."   *Lucent*

*Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).[10]

AirFacts fails to meet its burden under this factor because it has not presented licenses that are "commensurate with" the trade secret that was misappropriated—that is, the flowcharts Mr. de Amezaga sent to Fareportal. *Uniloc*, 632 F.3d at 1316. Indeed, AirFacts has never licensed the flowcharts or any product like the flowcharts, so there is no way to know "the prices past purchasers or licensees may have paid" for them. *University Computing*, 504 F.2d at 539.

Instead, AirFacts asserts that it charges about $3.2 million for a three-year license on its flagship ticket auditing software, TicketGuard. (ECF No. 122, at 18). Working backwards from that value, AirFacts' expert, Michelle Riley, conducted nested

---

[10] In calculating royalty damages for patent infringement cases, the Federal Circuit applies a multi-factor "hypothetical negotiation" approach, in which the court "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent*, 580 F.3d at 1324. The approach is based on *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, (S.D.N.Y. 1970), rather than *University Computing*, but many of the *Georgia-Pacific* factors are effectively identical to the *University Computing* factors. For instance, the second *Georgia-Pacific* factor, "[t]he rates paid" for other licenses, *see* 318 F.Supp. at 1120, is effectively the same as the second *University Computing* factor—the "prices past purchasers or licensees may have paid." Thus, this court treats the Federal Circuit's analysis of the second *Georgia-Pacific* factor as persuasive here. *See also StorageCraft*, 744 F.3d at 1189 (explaining that *University Computing* and *Georgia-Pacific* identified "overlapping" factors).

calculations to try to estimate the value of the flowcharts by themselves.  She noted that the flowcharts show some of the logic involved in the Fare by Rule auditing process, that 27.1% of the tickets audited by TicketGaurd go through a Fare by Rule audit, and that the Fare by Rule process is part of TicketGuard's "back end" "automated auditing function," which AirFacts argues is worth 50% of TicketGuard's value.  (ECF No. 122, at 18).  Thus, Ms. Riley estimated that a three-year license for the flowcharts would be worth about $440,067, a figure which represents 27.1% of 50% of TicketGuard's $3.2 million license price.  (ECF No. 122, at 18).

As this court noted in a prior opinion, "the evidence undermines" Ms. Riley's calculation.[11]  But even if the calculation

---

[11] *See AirFacts, Inc. v. de Amezaga*, 502 F.Supp.3d 1027, 1044 (D.Md. 2020) (noting that Ms. Riley erroneously assumed that Mr. de Amezaga used the flowcharts solely to "undermine AirFacts' market position" and finding that, contrary to Ms. Riley's assumptions, "the flowcharts were of little value to AirFacts" because they were meant "to help AirFacts automate its processing of Fare by Rule tickets . . . [and] AirFacts [i]s still unable to automate the Fare by Rule ticket processing") (internal citations omitted).  Ms. Riley's calculation is also flawed in other ways.  For instance, she assumes that TicketGuard's automated auditing function is independently worth 50% of the software's value.  But there is no support for that assumption in the record—AirFacts presented no evidence at trial to show the independent value of different parts of its software.  What is more, AirFacts has never provided its customers with automated Fare by Rule auditing services, (*see* ECF No. 122, at 22), so it makes little sense to assert that flowcharts showing Fare by Rule auditing logic could be worth *any* percentage of TicketGuard's "automated auditing functions," let alone the 27.1% value that Ms. Riley claims.  She also failed to consider any factor that would not favor a high royalty calculation.  (ECF No. 113, at 29-31).  Given these ample shortcomings, the court will not rely on Ms. Riley's opinions here.

were not so flawed, TicketGuard's license value is not relevant here because this factor is concerned with licenses for products "commensurate with" the trade secret, *see Uniloc*, 632 F.3d at 1316, and TicketGuard is not "commensurate with" the flowcharts.  The flowcharts are simply not part of TicketGuard—as AirFacts itself admits, "[w]hen an AirFacts customer signs a license to use [TicketGuard]," it "do[es] not [gain] access to . . . the Flow Charts." (*See* ECF No. 122, at 23).

Indeed, it would not even be accurate to say that the flowcharts comprise a subset-of-a-subset of the TicketGuard product, as AirFacts' nested calculations seem to suggest.  Rather, the flowcharts merely show the steps an auditor should take when auditing a ticket missing a certain kind of data.  (ECF No. 94, at 23:19-25, 24:1-8).  AirFacts originally created the flowcharts in order to use them to develop an automated Fare by Rule auditing process, which it then hoped to incorporate into its services.  (ECF No. 72, at 72:15-25).  But AirFacts never succeeded in that endeavor—it still has not automated its Fare by Rule auditing function.  (ECF No. 122, at 21).  Far from representing a component of TicketGuard, the flowcharts are the first step in a development process for a service that AirFacts hopes later to provide.  Thus, even if AirFacts could reliably splice up the value of TicketGuard as it seeks to do, the flowcharts themselves comprise no part of the $3.2 million value on which AirFacts relies.

In its opinion remanding this case, the Fourth Circuit instructed this court to "determine which [*University Computing*] factors are relevant here." *AirFacts*, 30 F.4th at 369. Heeding that instruction, this court finds that the past licenses factor is not relevant because AirFacts has provided no evidence of a past license comparable to Mr. de Amezaga's use of the flowcharts.

### 3.   Plaintiff's Valuation of the Trade Secret

The third *University Computing* factor is "the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business." 504 F.2d at 539. AirFacts argues that TicketGuard is "absolutely critical" to its business, that its Fare by Rule services are a "major component" of TicketGuard, and that the disclosed flow charts reflect some of the Fare by Rule process. (ECF No. 122, at 20). AirFacts also claims that TicketGuard cost millions of dollars to develop, although it does not provide a specific development value for the disclosed flowcharts themselves. (ECF No. 122, at 20).

But regardless of the precise value AirFacts places on the flowcharts, *University Computing* renders AirFacts' valuation irrelevant here. While *University Computing* noted that a plaintiff's valuation of a trade secret may sometimes be considered in assessing damages, it also clarified that "normally the value of the secret to the plaintiff is an appropriate measure of damages

only when the defendant has in some way destroyed the value of the secret." 504 F.2d at 535. For instance, when a defendant publishes misappropriated information such that "no secret remains," it makes sense for damages to be based in part on the plaintiff's valuation of the secret it has now lost. *Id.* But "where the secret has not been destroyed," the plaintiff's valuation is "an inappropriate measure" for damages because the plaintiff "retains . . . use of the secret" despite the defendant's misappropriation. *Id.* at 535-36. Applying that reasoning, the *University Computing* court found it would be "inappropriate" to consider a plaintiff's valuation in deciding trade secret damages where the defendant had disclosed the secret only to a party who kept the secret "in confidence" and thus did not "destroy[] the value of the secret to the plaintiff." *Id.* at 535 n.27.[12]

Here, AirFacts' valuation of the flowcharts is "an inappropriate measure" for damages because Mr. de Amezaga's disclosure to Fareportal did not "destroy the value" of the

---

[12] *See also Softel, Inc. v. Dragon Med. and Scientific Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (rejecting a damage calculation based in part on plaintiff's valuation of its trade secret because the defendant "did not publish" plaintiff's secret, and under *University Computing*, "such a measure usually [i]s appropriate only where the defendant ha[s] destroyed the value of the secret"); *cf. Software Pricing Partners, LLC v. Geisman*, 3:19-cv-00195-RJC-DCK, 2022 WL 3971292, at *10 (W.D.N.C. Aug. 31, 2022) (reducing royalty damages in part because the defendant "did not destroy any . . . trade secrets[,] which remain a significantly valuable asset [to the plaintiff]").

flowcharts or of TicketGuard more broadly—rather, AirFacts
"retains use of" both items. *Id.* at 535-36. AirFacts concedes
that TicketGuard remains an "absolutely critical" part of its
business. (ECF No. 122, at 20-21). And Ms. Pearson testified
that even after Mr. de Amezaga sent the flowcharts to Fareportal,
AirFacts continued to use them to make its team "more efficient"
and to "save[] time." (ECF No. 71, at 41:19-21). So even if the
flowcharts really are as valuable as AirFacts seems to claim, that
valuation matters little in deciding damages because AirFacts has
not been deprived of the value the flowcharts provide.[13]

---

[13] At an earlier stage of this case, the Fourth Circuit found
that the flowcharts are "trade secrets" under MUTSA because they
have "independent economic value." *AirFacts I*, 909 F.3d at 97.
But the fact that a trade secret has independent value does not
mean that its owner is always entitled to royalty damages. Under
MUTSA, a trade secret must have "independent economic value," and
that value can be based on "potential" uses of the trade secret by
parties who improperly acquire it. Md. Code Com. Law § 11-
1201(e)(1). Royalty damages, on the other hand, must be based on
the *actual* "use of [the] trade secret," not a potential use. Md.
Code Com. Law § 11-1203(c). Thus, a MUTSA plaintiff can prove
that certain information is a trade secret by showing that a
competitor could "potential[ly]" use it in some harmful way. *Motor
City Bagel, L.L.C. v. American Bagel Co.*, 50 F.Supp.2d 460, 479
(D.Md. 1999). But to be entitled to royalty damages, a "potential"
use is not enough—the plaintiff must prove that the defendant's
misappropriation actually "result[ed]" in an unauthorized use that
affected the plaintiff. *See id.* Here, the Fourth Circuit found
that the flowcharts have independent economic value in part because
if the flowcharts became "ascertainable to outsiders," then those
outsiders could use the flowcharts such that AirFacts could no
longer leverage them "to its advantage in the marketplace."
*AirFacts I*, 909 F.3d at 96, 97 n.8. That *potential* use gave the
flowcharts independent economic value and made them a trade secret,
but because no competitors *actually* used the flowcharts that way,

32

### 4.   Defendant's Intended Use

The fourth *University Computing* factor is "the nature and extent of the use the defendant intended for the secret."   504 F.2d at 539.   Federal courts have found that this factor favors royalty damages where a defendant misappropriated a trade secret with the "inten[t] to sell" the secret, *see University Computing*, 504 F.2d at 541, the intent to get "revenge" on the plaintiff, or the intent to help a competitor "compete with" the plaintiff*, see StorageCraft*, 744 F.3d at 1190.   When a defendant discloses a secret for any of these reasons, royalties are appropriate because the defendant sought to "put the trade secret to . . . use in ways harmful to the secret's owner."   *Id.* at 1186.   By contrast, this factor may weigh against royalty damages where a defendant intended to disclose the secret only to "someone who . . . couldn't make use of the secret and who therefore couldn't do serious damage to the trade secret or its rightful holder."   *Id.* at 1189.

Here, this factor weighs against royalty damages because Mr. de Amezaga did not intend to use the flowcharts in any way that was "harmful to" AirFacts.   *Id.*   Rather, he sought to use the flowcharts only to demonstrate a sample of his work product to a prospective employer.   (ECF No. 94, at 23:11-18).   He did not believe he was disclosing trade secrets, nor did he believe that

the Fourth Circuit's independent economic value finding does not impact the reasonable royalty calculation.

Fareportal could or would use the flowcharts to harm AirFacts. (ECF No. 94, at 25:13-20).  He likewise did not intend to "sell" the flowcharts, *see University Computing*, 504 F.2d at 541, to get "revenge" on AirFacts, or to help Fareportal "compete with" AirFacts*, see StorageCraft*, 744 F.3d at 1190.

Conceding that Mr. de Amezaga did not believe he was disclosing trade secrets, AirFacts argues that "the motive of the defendant" is irrelevant—rather, all that matters is whether the defendant disclosed a secret to a party that had "the potential to do damage" to the plaintiff. (ECF No. 122, at 24).  Thus, AirFacts argues, because Fareportal might use the flowcharts to harm AirFacts, royalty damages are appropriate here.  As has already been discussed, the record does not support AirFacts' claim that Fareportal could use the flowcharts to harm AirFacts.  But beyond that, AirFacts is also mistaken to assert that "the motive of the defendant" is irrelevant.  To the contrary, *University Computing* itself held that the defendant's motive *matters*—it explained that the fourth royalty factor is concerned with "the use the defendant *intended*."  504 F.2d at 539 (emphasis added).  Applying that rule, the *University Computing* court approved royalty damages based in part on the jury's finding that the defendant "*intended* to sell the system it had misappropriated."  *Id.* at 541 (emphasis added).

Resisting that reasoning, AirFacts argues that this case is more like *StorageCraft Tech. Corp. v. Kirby*, a case in which the

34

United States Court of Appeals for the Tenth Circuit upheld a jury's royalty damage award.  744 F.3d at 1183; (ECF No. 122, at 24).  But *StorageCraft* actually undercuts AirFacts' argument.  In that case, the defendant sought "revenge" against the plaintiff, and "in a fit of retaliatory pique," he "intentionally disclosed" the plaintiff's trade secret to "an able competitor," "aware that [the competitor] could well use the secret to compete with [the plaintiff]."  *Id.* at 1186, 1189.  The Tenth Circuit found that a jury could reasonably award royalty damages based on "[t]hat set of facts—that particular kind of use." *Id.* at 1190.  Thus, rather than rejecting consideration of a defendant's motives, *StorageCraft* expressly approved royalty damages based on the defendant's "retaliatory" intent and his "aware[ness]" that his disclosure would likely harm the plaintiff.  *Id.* at 1186, 1189-90.  And the "particular kind of use" at issue in *StorageCraft* is nothing like Mr. de Amezaga's actions here.  *Id.* at 1190.  Far from achieving "revenge" by disclosing secrets to an "able competitor" with the "aware[ness]" that the disclosure could cause harm, *see id.* at 1189, Mr. de Amezaga innocuously shared documents with a non-competitor, believing that the disclosure would not harm AirFacts.

### 5.  Other Unique Factors

Finally, *University Computing* instructs courts to consider "other unique factors in the particular case which might have

affected the parties' agreement." 504 F.2d at 539. Mr. de Amezaga does not ask the court to consider any unique factors beyond the four discussed above. AirFacts asks this court to consider one added factor: Mr. de Amezaga's "inten[t] to remain in the airline ticket industry" after leaving his job at AirFacts. (ECF No. 122 at 26). AirFacts argues that if Mr. de Amezaga had "disclosed he was leaving Airfacts to work in the same industry," the company "would have required a [more] substantial royalty." (ECF No. 122, at 26-27).

The court will not consider Mr. de Amezaga's intent to remain in the airline industry in calculating royalty damages. To start, royalty damages are meant to reflect a "fair price for licensing the defendant to [use] the trade secret" in the way that he did, *see University Computing*, 504 F.2d at 539, not to punish a defendant for other conduct unrelated to his misappropriation. Mr. de Amezaga's mere decision to remain in the airline industry— detached from any intent to use the flowcharts in his new job— neither made the disclosure more valuable to Fareportal nor made it more harmful to AirFacts. Thus, a "fair licensing price" for the flowcharts ought not reflect that decision. *Id.* Rather, imposing such damages would only punish Mr. de Amezaga for taking a job with one of AirFacts' customers—an act that was neither illegal nor a violation of his employment contract. *See AirFacts*

*I,* 909 F.3d at 94 ("Mr. de Amezaga did not breach [his employment contract] by working at American [Airlines].")

What is more, the Court of Appeals of Maryland has instructed that courts ought not impose MUTSA remedies that effectively punish "a departing employee" for "working for the employer of his or her choice." *LeJeune*, 381 Md. at 317, 321 (internal quotations omitted). Such remedies, the court reasoned, "distort the terms of the employment relationship" by allowing an employer-plaintiff to use a MUTSA claim to restrict a departing employee's future job prospects in ways beyond those allowed under the parties' previously negotiated noncompete agreement. *Id.* at 321 (quoting *EarthWeb, Inc. v. Schlack*, 71 F.Supp.2d 299, 311 (S.D.N.Y. 1999)). Simply put, a MUTSA remedy "should not act as an ex post facto covenant not to compete." *Id.* at 322 (quoting *Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F.Supp. 98, 101 (D.Minn. 1992)). Thus, MUTSA remedies based on a defendant's mere decision to "work[] for a competitor" are disfavored because they undercut Maryland's "policy in favor of employee mobility" and unfairly impose on the employee-defendant a court-created noncompete penalty that he or she had "no opportunity to negotiate." *Id.* at 316, 321-22 (internal quotations omitted).

AirFacts appears to be requesting precisely the kind of anti-competitive remedy that the Maryland high court discourages. Indeed, heightened MUTSA damages based solely on Mr. de Amezaga's

decision "to remain in the airline ticket industry" would effectively punish him for "working for the employer of his . . . choice" and function as a court-created noncompete penalty that he had "no opportunity to negotiate." *Id.* at 317, 321-22 (internal quotations omitted).  The court thus declines AirFacts' request to consider this factor in assessing royalty damages.

Evaluation of the *University Computing* factors compels the conclusion that AirFacts has not proven there is any fair licensing price for Mr. de Amezaga's disclosure of the flowcharts.  Thus, judgment will be granted for Mr. de Amezaga on AirFacts' MUTSA claim.[14]

---

[14] In other contexts, courts grant judgment for—and award nominal damages to—a plaintiff who proves the merits of a claim but fails to prove actual damages.  But MUTSA's unique text and structure require a court to grant judgment for the defendant where the plaintiff fails to prove statutory damages, even if it successfully proves misappropriation of a trade secret.  Like the trade secret laws in most other states, MUTSA is a near-verbatim adoption of the Uniform Trade Secrets Act, a model statute drafted by the Uniform Law Commission.  *LeJeune*, 381 Md. at 305.  And like the Act after which it is modeled, MUTSA "specifically provides" three ways—and only three ways—that a plaintiff seeking damages for misappropriation may succeed: (1) by proving actual loss, (2) by proving unjust enrichment, or (3) by establishing a reasonable royalty.  *See Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F.Supp.2d 1319, 1336 (S.D.Fla. 2006) (interpreting Florida's version of the Uniform Trade Secrets Act).  The "statutory language [does not] authoriz[e]" any other path to damages—including an award of "nominal damages" to a plaintiff who proved mere misappropriation without more.  *Id.*  In line with that logic, two prior opinions in this district have granted judgment for the defendant solely because a MUTSA plaintiff failed to prove damages. *See 3PD, Inc. v. U.S. Transport. Corp.*, No. 13-cv-2438-GJH, 2015 WL 4249408, at *3-4 (D.Md. July 9, 2015); *Brightview Group, LP v.*

### III. Conclusion

Because Plaintiff has not proven that Mr. de Amezaga materially breached the employment agreement by emailing the proration documents to his personal account and briefly retaining them, judgment will be entered in favor of AirFacts for $1.00 on the breach of contract claim. And because AirFacts has not met its burden to prove a fair licensing price for Mr. de Amezaga's use of the flowcharts, judgment will be entered in favor of Mr. de Amezaga on the MUTSA claim.

A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge

---

*Teeters*, No. 19-cv-2774-SAG, 2021 WL 1238501, at *16-17, *19 (D.Md. March 29, 2021).

Many other federal courts have reached the same conclusion when interpreting other uniform trade secret laws that are nearly identical to MUTSA. *See Alphamed Pharm. Corp.*, 432 F.Supp.2d at 1335-1338 (S.D.Fla. 2006) (collecting cases); *see also Check 'n Go*, 2005 WL 1926609, at *3; *C Plus Northwest, Inc. v. DeGroot*, 534 F.Supp.2d 937, 947 (S.D.Iowa 2008) (noting that when a jury finds that "the Defendants misappropriated trade secrets," but "d[oes] not believe that Plaintiffs suffered any harm as a result," "[s]uch a conclusion mandates a verdict in favor of Defendants"); *Mfg. Automation and Software Sys., Inc. v. Hughes*, 833 Fed.App'x 147, 148 (9th Cir. 2021) (holding that a district court properly "enter[ed] judgment for defendants" where a plaintiff raising a misappropriation claim failed to prove actual loss, unjust enrichment, or a reasonable royalty). Thus, AirFacts' failure to establish a reasonable royalty compels judgment for Mr. de Amezaga, rather than judgment for AirFacts coupled with nominal damages.